Northern J. CALLOWAY, individually and on behalf of LMN Productions, Inc., Plaintiff–Appellant, Cross–Appellee,

v.

The MARVEL ENTERTAINMENT GROUP, A DIVISION OF CADENCE INDUSTRIES CORPORATION, James Galton, Al Brodax, Michael S. Klein, Luis Quiros, the Shukat Company, Ltd., Scott Shukat and Peter S. Shukat, Esq., Defendants–Appellees,

The Marvel Entertainment Group, a division of Cadence Industries Corporation, James Galton and Al Brodax, Defendants–Appellees, Cross–Appellants.

The MARVEL ENTERTAINMENT GROUP, A DIVISION OF CADENCE INDUSTRIES CORPORATION, James Galton, Al Brodax, Michael S. Klein, Luis Quiros and LMN Productions, Inc., Third–Party Plaintiffs–Appellees,

v.

The SHUKAT COMPANY, LTD., Scott Shukat and Peter S. Shukat, Esq., Third–Party Defendants–Appellees,

The Shukat Company, Ltd., and Scott Shukat, Third–Party Defendants–Appellees, Cross–Appellants,

Pavelic & LeFlore (now dissolved), counsel at trial for plaintiff, Appellants–Cross–Appellees,

Ray L. LeFlore, individually and as a partner of Pavelic & LeFlore (now dissolved), Appellant–Cross–Appellee.

Nos. 275, 385, Docket 86–7752, 86–7754 and 87–7262.

United States Court of Appeals, Second Circuit.

Argued Oct. 28, 1987.

Decided Aug. 12, 1988.

William Piel, New York City (Robert J. Katz, Arline Mann, Merle M. Martin, Sullivan & Cromwell, New York City, of counsel), for appellant-cross-appellee Ray L. LeFlore.

Radovan Pavelic, New York City, pro se for appellant-cross-appellee Pavelic & LeFlore (now dissolved).

Robert B. McKay, Santora & McKay, New York City, for defendants-appellees, cross-appellants The Marvel Entertainment Group, James Galton and Al Brodax.

Norman B. Arnoff, New York City, (Linda K. Brockett, Rosilyn, Newman, Arnoff & Siskind, New York City, of counsel), for third-party defendant-appellee Peter S. Shukat.

Sol V. Slotnik, Pomerantz & Slotnik, New York City, for third-party defendants-appellees The Shukat Co., Ltd. and Scott Shukat.

I. Scott Bieler, New York City (E. Michael Bradley, Brown & Wood, New York City, of counsel), for defendant-appellee Luis Quiros.

Before FEINBERG, Chief Judge, NEWMAN and WINTER, Circuit Judges.

WINTER, Circuit Judge:

This appeal and cross-appeal require us principally to decide whether sanctions of

$200,000 were properly imposed under Rule 11, Fed.R.Civ.P., on an attorney, his firm and his client. We also address the question of whether sanctions may be imposed under 28 U.S.C. § 1927 after a case has been settled and dismissed. The sanctioned attorney, Ray L. LeFlore, appeals from Judge Sweet's award of $50,000 in sanctions against him individually and $73,000 ($50,000 under Rule 11, $23,000 under Section 1927) against his now-dissolved law firm, Pavelic & LeFlore. LeFlore's former law partner, Radovan Pavelic, also appeals the award of $73,000 in sanctions against Pavelic & LeFlore, arguing that Rule 11 sanctions can be imposed only against the signer of a pleading or paper and not against the signer's firm. Judge Sweet also imposed sanctions against LeFlore's former client and the plaintiff in this case, Northern J. Calloway, of $100,000 under Rule 11 and $10,000 under 17 U.S.C. § 505 (1982). Calloway's pro se appeal has been dismissed for failure to prosecute. A cross-appeal seeking to increase the amount of sanctions against LeFlore, his firm and Calloway has been filed by defendants-appellees, cross-appellants The Marvel Entertainment Group ("Marvel"), an animation and motion picture company that is best known for its comic books; James Galton, the president of Marvel; and Al Brodax, a consultant to Marvel (collectively "the Marvel defendants"). Judge Sweet's decisions are reported at 111 F.R.D. 637 (S.D.N.Y.1986) and 650 F.Supp. 684 (S.D.N.Y.1986).

## OVERVIEW

Because an overview of the underlying litigation is essential to an understanding of the issues, we briefly summarize the proceedings before setting them out in detail. This acrimonious litigation involved scattershot allegations by the plaintiff of copyright infringement, defamation, civil conspiracy, tortious interference, misrepresentation, fraud, breach of fiduciary duty, forgery and document tampering. Calloway's action sought $11 million in compensatory damages and $33 million in punitive damages from: Calloway's two business partners, Michael S. Klein and Luis Quiros;

his theatrical agent, Scott Shukat; his longtime attorney, Peter Shukat; and the Marvel defendants. The core issue was whether the Marvel defendants had infringed Calloway's copyright in a script for a proposed animated science-fiction movie musical, "The Skyrider."

Calloway's case was at all times very weak. A principal vulnerability stemmed from the fact that the original complaint had attached to it as exhibits photocopies of written contracts between Calloway and various defendants. These copies indicated on their face that Calloway had sold all his rights in "The Skyrider" to LMN Productions, Inc. ("LMN") and the authenticity of these copies was not challenged. Because LMN had transferred those rights to the Marvel defendants, their use of Calloway's copyrighted work could not constitute actionable infringement. The original complaint was dismissed on technical grounds, however, and an amended complaint was filed that denied that plaintiff had signed the agreements in question. Specifically, it alleged that Calloway's former attorney, Peter Shukat, had without Calloway's authorization or knowledge, "affixed a facsimile of plaintiff's signature to a series of documents." We will refer to this claim as "the facsimile claim." The facsimile claim was then successfully relied upon by Calloway to defeat a motion for summary judgment. The facsimile claim was, however, abandoned before trial but replaced by two new claims. In these claims Calloway admitted that he had signed the contracts. The first new claim alleged that the contracts had been altered by various means, including white-out, after they were signed. We will refer to this as "the white-out claim." The second new claim alleged that fraudulent misrepresentations by Peter Shukat caused Calloway to sign the contracts.

After a six-week trial, the jury returned a verdict for the defendants. The successful defense of this litigation cost the defendants over $900,000. They sought this amount in full in post-trial motions for sanctions against Calloway and his lawyers, LeFlore, who began this action on Calloway's behalf, and the firm of Pavelic & LeFlore, which had been formed in Octo-

ber 1984 and represented Calloway thereafter. Pavelic & LeFlore continued to represent Calloway in defending the motions for sanctions notwithstanding an obvious conflict of interest. Judge Sweet granted the motions in part and imposed sanctions under Rule 11 for the pursuit of the facsimile claim. These amounted to $50,000 on LeFlore, and $50,000 on Pavelic & LeFlore. An additional $23,000 of sanctions was imposed on the firm under 28 U.S.C. § 1927 for failure to accept a settlement offering full relief from Quiros. A separate judgment for sanctions in the amount of $110,-000 was imposed on Calloway. Of this, $100,000 was imposed under Rule 11 and $10,000 under 17 U.S.C. § 505, which authorizes an award of fees to a prevailing party in a copyright action. LeFlore and Pavelic appealed, and the Marvel defendants cross-appealed. Calloway filed a pro se appeal, but that appeal was dismissed for lack of prosecution.

We affirm the award of sanctions against LeFlore and his firm. *Sua sponte,* we reinstate Calloway's appeal with regard to Rule 11 sanctions. LeFlore and his firm had a blatant conflict of interest and should have withdrawn as Calloway's counsel in defending the motions for sanctions. Because of this representation, no argument was made on Calloway's behalf that LeFlore was solely responsible for pursuit of the facsimile claim, notwithstanding considerable evidence supporting that view. Nor was an argument made that even if sanctions should be imposed on Calloway, LeFlore and his firm should be jointly and severally liable for them. We vacate the Rule 11 sanctions against Calloway and remand for a determination of those issues. On remand the district court shall also determine whether, if the sanctions against Calloway are reduced, the lawyers should be liable for those sanctions from which Calloway is relieved. Finally, we reverse the sanctions imposed against Pavelic & LeFlore under 28 U.S.C. § 1927 (1982).

## BACKGROUND

### 1. *The Parties and "The Skyrider" Project*

Because LeFlore takes the astonishing position that he never advanced the facsim-

ile claim, it is necessary to describe the parties and transactions underlying this litigation in what would otherwise be unnecessary detail. The plaintiff, Northern J. Calloway, is an actor best known for his role as David on the children's television program "Sesame Street." In 1979, Calloway became interested in developing a motion picture, "The Skyrider," that would combine animation, science fiction and music. Although Calloway had appeared in several movies, he apparently had no prior experience in film production, animation, merchandising or budgeting. Nor had he ever written a screenplay. Calloway's initial efforts to launch "The Skyrider" project consisted of writing songs in collaboration with a friend, Gavin Spencer, obtaining futuristic drawings from an artist, Sammis McLean, and hiring one David Roth, whom Calloway had met by chance at the Hayden Planetarium, to compose a brief story outline. Calloway also prepared a rough "presentation book," and, with the assistance of his agent, Scott Shukat, sought unsuccessfully to interest various motion picture companies in the project.

In December 1980, Calloway fortuitously met Luis Quiros, an insurance salesman, in the lobby of a Manhattan office building. Soon thereafter, Quiros introduced Calloway to Michael Klein, a dentist and Quiros's neighbor on Long Island. Although neither Quiros nor Klein had experience in the movie business, the three men sought to interest various investors in financing "The Skyrider." In March 1981 Klein, through a neighbor, arranged to present the project to James Galton and Al Brodax at Marvel. Galton and Brodax expressed some interest in "The Skyrider" but stated that Marvel was not interested in financing a film at an estimated $5 million cost. Rather, Marvel wanted to use certain of the proposed film's characters in its comic books.

Sometime between June 8, 1981 and August 5, 1981, Calloway, Klein and Quiros formalized their relationship by signing a series of documents. These documents

were prepared by Peter Shukat, Calloway's longtime attorney, and Egon Dumler, an attorney who specialized in preparing theatrical agreements. The first document, dated June 8 but executed and notarized on August 5, was a shareholder's agreement for LMN Productions, Inc., a corporation formed to finance and produce the film. The three remaining documents, the option agreement, the writer's agreement, and the music agreement, were all dated June 8. Calloway testified that he signed all four agreements on June 8, while Klein and Quiros maintained that none of them was signed until August 5. Calloway later admitted that he signed a version of the shareholder's agreement on August 5.

During this period, Calloway was undecided, apparently for tax reasons, whether he would participate in the project as an individual or through a wholly-owned corporation that would provide his services, Netta Productions, Inc. ("Netta"). This uncertainty resulted in the option agreement, writer's agreement and music agreement undergoing several drafts, with some naming Netta as a party and others naming Calloway as a party. Peter Shukat testified that neither he nor Dumler used a word processing machine in preparing these documents. The final version of these agreements thus evidenced the use of "white-out" to make variations concerning Netta and Calloway as well as several typographical errors resulting from the failure to insert "Calloway" or "Writer" in place of "Netta."

The option agreement among LMN, Calloway and Gavin Spencer (who had written some music for the project) granted LMN an option to produce "The Skyrider" upon certain conditions precedent, including the raising of preproduction expenses within seventy-five days and the full production budget within one year thereafter. The option agreement incorporated the writer's agreement and the music agreement. The writer's agreement, which became effective on the exercise by LMN of the option, stated that Calloway, the "Writer," would grant to LMN, the "Producer," all rights to Calloway's services under the agreement and to all writings produced thereunder, including the right to alter such writings. The music agreement among LMN, Calloway and Spencer provided LMN with similar rights to the music for "The Skyrider."

On September 6, 1981, Scott Shukat, Calloway's agent, purporting to act on Calloway's behalf, signed documents extending until September 30, 1981 LMN's right to exercise the option. Calloway later claimed that this extension was invalid because he, Calloway, had signed the original agreements only in his capacity as an officer of Netta, and Scott Shukat had authority to grant such an extension only on Calloway's behalf as an individual, not as a corporate officer. That same month, however, at a meeting attended by Calloway, Klein, Quiros, Galton and Brodax, Marvel agreed in principle with all the parties, including Calloway, to produce "The Skyrider" at a $5 million budget. Marvel was to have artistic and budgetary control and pay any overage above $5 million. LMN was still to raise the initial $5 million.

In September 1981 the sole disagreement among the parties appears to have concerned the amount of computerized animation in the film, an expensive item. 111 F.R.D. at 644. Calloway apparently wanted to spend $12 million on the film, while Brodax contemplated a $5 million budget. Nevertheless, Calloway appeared willing to proceed with production of the movie at the $5 million figure. *Id.*

By mid–September 1981 and as a result of the extension, LMN had been able to raise the front money, although efforts to raise additional funding proved unsuccessful. As a result, Calloway received a check for $22,500 dated September 21 as his share of the front money, the largest amount he had ever received for his artistic services. The check to Calloway was made out to him personally and not to Netta. He reported it as income on his personal tax return.

In November 1981, Marvel prepared a new presentation book ("Marvel presentation") to assist in raising the $5 million. This book included Sammis McLean's futuristic drawings, David Roth's story outline,

and a five-page introduction and brief conclusion or "bookends" written by Brodax. Klein and Quiros approved the contents of this book on LMN's behalf. It was the Marvel presentation that was alleged to have infringed Calloway's copyright.

A formal agreement between Marvel and LMN was signed on February 1, 1982. Galton signed on behalf of Marvel, and Calloway and Klein signed for LMN. The relationship between Calloway, Klein and Quiros had apparently soured somewhat by that time. Calloway disputed several items in the proposed budget for the film and agreed to sign the Marvel agreement only if it was placed in escrow with Peter Shukat, his attorney, until the disagreements were resolved. On February 9, after Calloway, Klein and Quiros had apparently resolved their differences, Peter Shukat released to Dumler, LMN's attorney, the Marvel agreements. By May, however, the LMN shareholders were again quarreling.

Calloway later claimed that he first saw the Marvel presentation at about this time and was particularly disturbed by the Brodax "bookends," which somewhat altered the story line of "The Skyrider." The Marvel presentation was generally based on Roth's original synopsis except that in the Marvel presentation, the protagonist, Sy Ryder, is a motorman on the 8th Avenue Line, who becomes Sky Rider, a space hero, while playing a video game in his dreary Manhattan apartment. The copyrighted screenplay written by Calloway and Roth, however, omitted "any reference to the worldy-realities of day-to-day existence on the planet Earth," Amended Complaint ¶ 29, while the Marvel presentation included references to " 'cockroaches,' 'toilet[s] on the BMT,' 'indigestion,' 'mayhem' and 'sludge.' " *Id.* Calloway believed that, as a result, the Marvel presentation demeaned, cheapened and infringed his copyrighted material. It was this molehill of dissatisfaction that led to a mountain of litigation consisting of years of discovery, ten pretrial opinions, a six-week trial, and a record filling six cartons.

## 2. The Lawsuit

In August 1982 Calloway retained attorney Ray LeFlore to bring the suit underlying this appeal. The original complaint, filed in December 1982, and signed by LeFlore, named as defendants Klein, Quiros, Dumler's law firm of Dumler & Giroux, LMN, Peter Shukat, Scott Shukat, the Shukat Company, Ltd. ("SCL"), Marvel, Galton and Brodax. It alleged the willful infringement of Calloway's copyright ("Cause of Action" I), the malicious destruction of the entire value of his copyright (II), unauthorized use of Calloway's name (III), Peter Shukat's intentional breach of his professional obligations as Calloway's attorney (IV), Scott Shukat's and SCL's breach of their fiduciary duties (V), fraud (VI), knowing violation of plaintiff's escrow agreements (VII), and breach of contract (VIII). The complaint sought $11 million in compensatory damages, punitive damages in an unspecified amount, and costs and attorney's fees.

The original complaint included as exhibits the shareholder's, option, writer's and music agreements. No claim of document tampering, forgery or the use of a facsimile of Calloway's signature on any document was made. Although the exhibits were photocopies, the authenticity of the documents was undisputed, as was the genuineness of the signatures. Calloway's sole claims regarding these agreements was that LMN had not properly exercised its option in "The Skyrider" within the agreed upon time because Scott Shukat did not have the authority to extend the option on behalf of Netta but only on behalf of Calloway as an individual.

From the very beginning, plaintiff's case suffered from obvious and grave weaknesses. Because "The Skyrider" was never produced, none of the defendants had profited, and most had lost money on the venture. (Calloway appears to have profited to the extent of $22,500.) The claim that the Marvel presentation had diminished, much less destroyed, the value of Calloway's copyright seemed entirely speculative. The existence of substantial damages was thus in doubt, no matter how powerful

the evidence of actionable infringement might be. The liability portion of the case was also flawed, however. The option agreement granted LMN the right to use Calloway's copyrighted script in order to raise funds for the proposed film. The granting clause of the writer's agreement,[1] one of the two agreements incorporated into the option agreement, transferred to LMN all of Calloway's rights to "The Skyrider," including the right to "revise" the material "in any manner." LMN had in turn transferred those rights to Marvel. Calloway's entire copyright claim rested on the contention that Scott Shukat had authority to act only for Calloway personally, not for the corporation Netta, and that the September extension to LMN was invalid. However, Calloway himself agreed in his testimony that Netta was merely his "alter ego," and he had accepted the $22,500 check made out to him in his individual capacity after the extension. He reported this sum on his personal income tax return and deducted all business expenses relating to the Skyrider project on that return. Finally, his participation in meetings with Marvel well after the extension and his signing on LMN's behalf of a contract passing the rights to "The Skyrider" to Marvel further undermined his claim that the extension was invalid. Moreover, because Calloway's only federal claim was based on copyright infringement by the Marvel presentation and it was clear that many of the defendants, such as the Shukats, had not participated in or profited from the infringement, subject matter jurisdiction as to them was in doubt.

The copyright issue came to a head when the Marvel defendants moved to dismiss on the ground, *inter alia*, that the agreements attached to the copyright on their face permitted the use of Calloway's copyrighted work, including changes in the plot and characters. Because the Marvel defendants were the only alleged infringers and there was no colorable federal claim against the remaining defendants (who might in any event be unable to satisfy a large judgment), the contracts attached as exhibits to the complaint had become a considerable legal albatross around Calloway's action.

On June 30, 1983, Judge Sweet dismissed the complaint, not on the ground that the agreements authorized the alleged infringement, but on the technical ground that the complaint failed to plead copyright infringement with particularity by neglecting to specify the registration number of the copyright, and the dates and occasions on which the alleged infringement occurred.

An amended complaint, again signed by LeFlore, was filed on August 1, 1983. This complaint alleged that Calloway had "signed and initialed" a series of agreements on June 8, 1982 (¶ 44). However, it also stated that "[o]n or about August 5, 1981, without plaintiff's knowledge or consent, Peter Shukat improperly affixed a facsimile of plaintiff's signature to a series of documents, back-dated to June 8, 1981" that were different from the agreements Calloway had signed and initialed (¶ 52), and that "Shukat had no authority whatsoever to purport to affix plaintiff's signature to said documents...." (¶ 53). This was the original assertion of the facsimile claim. The belated raising of this claim has been explained on the ground that only after LeFlore and Calloway saw the *origi-*

---

1. The granting clause provided:

 Writer hereby grants to Producer, exclusively and perpetually, all now or hereafter existing rights of every kind and character whatsoever, whether or not such rights are now known, recognized or contemplated, and the complete unconditional and unencumbered title throughout the world in and to: Writer's services pursuant to this agreement; any and all results and proceeds thereof; and any and all literary, dramatic and musical material, incidents, plots, dialogue, characters, action, gags, routines, ideas, inventions and other material written, composed, submitted, added,

 improvised, interpolated and invented by Writer hereunder.

 \* \* \* \* \* \*

 Producer may add to, subtract from, arrange, rearrange, revise and adapt all such material in any manner, and Writer hereby waives the "moral rights" of authors, as said term is commonly understood. All such material and the world-wide copyright therein (including all renewals and extensions of such copyright) shall automatically be and become the property of Producer and Producer shall be deemed to be author thereof, Writer acting entirely as Producer's employee for hire.

*nal* agreements (the exhibits to the first complaint being photocopies), which had been produced in discovery, did they realize that a facsimile of Calloway's signature had been used. The facsimile claim, if believed, was of course a viable response to the Marvel defendants' contention that the agreements attached to Calloway's initial complaint authorized the Marvel presentation. A trier of fact, however, might well raise an eyebrow at the claim that the forgery went undiscovered until the original contracts were produced because their provisions were identical to those of the photocopies attached as exhibits to the original complaint.[2] It should also be noted that the original documents clearly showed the use of white-out in the text (the photocopies were made after the white-out). The amended complaint, however, made no claim involving the alteration of words with white-out.

The amended complaint repeated the host of legal theories against most of those involved in the Skyrider project, sought $11 million in compensatory damages and specified $33 million in punitive damages. Notwithstanding the gravely serious allegations of professional and felonious misconduct, however, which we summarize in the margin,[3] the gravamen of the complaint was still the federal claim of copyright infringement.

On December 22, 1983, Judge Sweet dismissed the amended complaint as to de-

**2.** The photocopies are identical in every respect to the originals produced by Dumler. The originals produced by Scott Shukat, which were also signed, differ in one respect from the Dumler originals. This difference is that on page 6 of the Shukat original of the Writer's Agreement in the fifth line of the second full paragraph, and the last line of the third full paragraph, the word "Writer" appears where in the Dumler original the word "Netta" appears. The reason for this minute inconsistency is that in the course of a markup intended to substitute Calloway in place of Netta as a party by changing the word "Netta" to "Writer," Dumler inadvertently overlooked two "Nettas" on page 6.

**3.** The first "cause of action" sought $11 million in damages from Marvel, Galton, Brodax, Klein and Quiros for infringing Calloway's copyright in "The Skyrider," and "maliciously destroy[ing] and tak[ing] from plaintiff the entire value of his copyright" by showing the Marvel presentation to various persons in the entertainment business.

The second cause of action sought $3 million in damages, plus $9 million in punitive damages, for defamation and violation of Calloway's "right to privacy." In essence, this claim was that the allegedly "vulgar references" in and "stereotypical appeal" of the Marvel presentation "irreparably damaged" Calloway's reputation.

The third cause of action named all of the defendants in a conspiracy to commit copyright infringement and claimed that "at Marvel's behest" Peter Shukat, plaintiff's attorney of ten years, was solicited to assist in the misappropriation of the copyrighted material (¶ 51), that Shukat "affixed a facsimile of plaintiff's signature to a series of documents" (¶ 52), that Klein, Quiros, Dumler, and the Shukats "together negotiated, drafted and purported to execute on plaintiff's behalf another series of agreements" (¶ 54), and that "plaintiff did not know that a series of false and deceptive agreements had been created by defendants." (¶ 56).

The fourth cause of action asserted that the "infringements, . . . slander and defamation . . . were knowing, willful and malicious," and sought $33 million in punitive damages.

The fifth cause of action accused Peter Shukat of "knowingly, violat[ing] his professional obligations to plaintiff and abus[ing] his positions of trust and confidence as plaintiff's own attorney" (¶ 72), and sought $11 million in damages.

The sixth cause of action asserted that SCL and Scott Shukat "knowingly . . . breached their fiduciary duties as plaintiff's managers" (¶ 74) and sought $11 million in damages.

The seventh cause of action was asserted derivatively on LMN's behalf. It admitted that: the June 8, 1981 agreements granted to LMN the rights in "The Skyrider," (¶ 76); admitted that LMN had successfully raised the $75,000 in front money (¶ 77); claimed that LMN had "secured both a guarantee of production and a commitment to fund the production of 'THE SKYRIDER,' in separate amounts of at least five million ($5,000,000) dollars" (¶ 77); concluded that the defendants had "unjustifiably interfered with LMN's contractual rights" and "maliciously destroyed" the project's value (¶ 78) and sought $5 million in damages (¶ 79). The complaint never stated who gave the $5 million guarantee of production and $5 million commitment to fund the production, although earlier in the complaint it was alleged that Marvel had proposed to produce the film at a $5 million budget (¶ 25).

The eighth cause of action accused Klein, Quiros and Dumler & Giroux of breaching their fiduciary obligations to LMN and sought $5 million in damages.

The ninth and final cause of action accused Klein and Quiros of misappropriating and wasting "substantial funds" of LMN. No dollar amount was provided.

fendants Peter Shukat, Scott Shukat, SCL and Dumler & Giroux for failure to state a federal claim of copyright infringement. He also dismissed the pendent state claims against those defendants. In doing so, he relied upon the failure of the complaint to allege that Peter Shukat had a financial interest in the infringing activities or that he had supervised, induced or materially contributed either to the production or distribution of the Marvel presentation. With respect to Scott Shukat, the amended complaint alleged in a single paragraph only that he had "directly contributed" to Marvel's creation of the infringing work. Amended Complaint ¶ 58. In an uncontradicted affidavit, however, Scott Shukat stated that he was not aware of the Marvel presentation until June 1982, months after it had been prepared and distributed, and that he did not know Marvel's Galton and had met Marvel's Brodax only once. Calloway never sought discovery or produced any evidence to rebut Scott Shukat's motion, even though the identical defense had been raised to the first complaint. With regard to Dumler & Giroux, Judge Sweet held that a law firm that negotiated agreements between the plaintiff and the alleged infringers could not be a contributory or vicarious infringer. As to the other defendants, Judge Sweet dismissed the third cause of action on the ground that there exists no distinct action for conspiracy under the Copyright Act, and he dismissed the fourth cause of action because punitive damages are not available in statutory copyright-infringement actions.

In a memorandum in opposition to defendants' motions to dismiss the amended complaint that was signed by LeFlore and filed October 19, 1983, LeFlore, *inter alia,* restated paragraphs 49 through 55 of the amended complaint alleging the facsimile claim. The memorandum then stated that: "The allegations quoted above leave no doubt that those documents on which plaintiff had been forced to rely [in the original complaint] are not the agreements which plaintiff 'signed and initialed' on or about June 8, 1981...."

After discovery, the remaining defendants, Marvel, Galton, Brodax, Klein and Quiros, moved for summary judgment on the ground that the June 8, 1981 agreements between Calloway and LMN authorized their use of Calloway's copyrighted work. In a fourteen-page affidavit in opposition that was written by LeFlore and dated April 2, 1984, Calloway stated in Paragraph 6:

I did not refer to, or annex, those documents which, I learned in the interim, had been contrived and forged by defendants. Instead, the Amended Complaint charged:

"52. On or about August 5, 1981, without plaintiff's knowledge or consent, Peter Shukat improperly affixed a facsimile of plaintiff's signature to a series of documents, backdated to June 8, 1981, purporting to confirm by formal agreement the terms and conditions of a putative option for LMN to acquire 'The Skyrider.'"

The documents referred to above, which I believe Peter Shukat contrived (and others perhaps forged) while he was my attorney and trusted advisor, are: the option agreement, the writers agreement and the composition agreement, all dated June 8, 1981....

Calloway further stated in Paragraph 7 of the affidavit:

Based upon my review of the originals of these three documents, produced in other proceedings, I hereby reaffirm that I neither signed nor approved those agreements. Defendants should not, I submit, be entitled to claim reliance upon documents which I now know were forged and contrived to deceive.

After stating that the defendants should "produce for this Court the agreements I actually 'signed and initialed,'" agreements which, Calloway stated, reserved various rights to him, Calloway asserted that:

Since all copies of the agreements I "signed and initialed" on or about June 8, 1981, were entrusted to Peter Shukat, once a defendant, I cannot now produce such agreements to the Court. I can state, nonetheless, that I never signed or

authorized the signing of any "option" agreement in my individual capacity. I only signed such agreements as an officer of Netta Productions, Inc. Nor did I sign any such option in August, 1981. No reference to the use of white-out or other alteration of the text of the documents was made anywhere in Calloway's affidavit.

Calloway's affidavit mentioned only briefly that Scott Shukat was not authorized to extend the option agreement. The briefs submitted on his behalf, however, made no mention of the issue of Scott Shukat's authority but instead relied upon the facsimile claim. Calloway's memorandum of law opposing summary judgment, also dated April 2 and signed by LeFlore, thus argued that:

> The only basis on which defendants could hope to obtain summary judgment in their favor is their claim that plaintiff signed or approved the agreements on which they purport to rely.
>
> Plaintiff's Affidavit, sworn to April 2, 1984, unequivocally attests that he neither signed nor approved the agreements on which defendants purport to rely. This Affidavit states: [repeats ¶¶ 6–7 of Calloway's Affidavit]. There could be no clearer statement that defendants have nothing authentic on which to rely.

Similarly, Calloway's reply memorandum of May 3, 1984, also signed by LeFlore, stated that:

> plaintiff has unequivocally affirmed that the documents on which defendants purport to rely were forged without plaintiff's knowledge or consent. Stated otherwise, defendants can find no support for their motions for summary judgment in rumblings about documents signed by others, a forced construction of language which plaintiff never approved, or any obvious disappointment by them at plaintiff's discovery of the originals of the documents which confirm they were signed by others.
>
> \* \* \* \* \* \*
>
> Once it is shown, as it already has been, that plaintiff did not sign or approve any such document, defendants'

only recourse is to claim-over against those individuals who either forged plaintiff's signature or represented they were authorized to sign for him.

If the motion for summary judgment had been granted, of course, the case would have ended. However, Judge Sweet denied the motion for summary judgment on July 3, 1984 because of the statements in Calloway's affidavit regarding the facsimile claim. He stated:

> Calloway does not dispute defendants' contention that the terms of the Option Agreement would authorize defendants' acts, but states by affidavit that he never signed or approved the Option Agreement and that Peter Shukat, without Calloway's knowledge, affixed a facsimile of Calloway's signature to the agreement. Later in his affidavit, however, Calloway states that he "never signed or authorized the signing of any 'option' agreement in my individual capacity. I only signed such agreements as an officer of Netta Productions, Inc. Nor did I sign any such option in August, 1981." Calloway has not explained the inconsistency between these two statements. His having signed the Option Agreement "as an officer of Netta Productions, Inc." appears to be without significance in this context. Calloway annexed the Option Agreement as an exhibit to the original complaint and did not challenge the authenticity of the Option Agreement during earlier motions in this case. He appears to contend that he signed an option agreement on June 8, 1981, in which he reserved the right to make all artistic decisions concerning "The Skyrider," but that the agreement he signed was altered without his consent, and that he did not discover these alterations until after he filed the complaint.

Judge Sweet then stated that "Calloway has by a narrow margin put sufficient facts in contention to withstand defendants' summary judgment motion." Opinion by Judge Sweet dated July 3, 1984, at 2. However, he warned Calloway and LeFlore that "this court has awarded attorney's fees against a plaintiff who was found

after trial to have pursued a claim in bad faith and without factual support" and that "[t]he court will not hesitate to award such costs if the facts are found after trial to warrant such an award." *Id.* at 3.

After the denial of summary judgment, Peter Shukat, Scott Shukat and SCL were brought back into the action after being named third-party defendants by the Marvel defendants. In denying a motion to dismiss the third-party complaint, Judge Sweet specifically relied upon the fact that its allegations included the claim that Peter Shukat had affixed a facsimile of Calloway's signature to the June 8 agreements. Opinion of Judge Sweet dated January 29, 1985, at 2.

It appears, therefore, that but for the facsimile claim, the case would have been over. Because of that claim, the action continued as to eight defendants. On appeal, LeFlore disputes the conclusion that the facsimile claim was crucial by arguing that Judge Sweet denied the Marvel defendants' motion for summary judgment because of a claim of *post-signature* alterations in the text, the white-out claim, rather than the facsimile claim. However, the facsimile claim was the *only* alteration claim that had been made at the time of the summary judgment motion. The white-out claim was not made until two years later. The facsimile claim alone was thus the basis for Judge Sweet's decision to deny summary judgment, as his later imposition of sanctions expressly stated. *See* 111 F.R. D. at 647 & n. 2.

In October 1984, LeFlore formed the partnership, Pavelic & LeFlore. Thereafter, pertinent papers in the case were signed:

PAVELIC & LEFLORE

By: *Ray L. LeFlore (s)*

(A Member of the Firm)

Attorneys for Plaintiff

Although LeFlore bore the laboring oar, his partner Radovan Pavelic did participate in various aspects of the case and at least two other lawyers, David Rees Gilliatt and Raymond L. Levites, appeared "of counsel" to Pavelic & LeFlore on Calloway's behalf.

In November 1984, LeFlore for the first time consulted a handwriting and document expert, Pearl Tytell. She not only declined to opine that Calloway's signatures on the contracts were forgeries but instead told LeFlore that they were "possibly" genuine. At trial, she testified that she never considered the signatures to be facsimile signatures.

Throughout the pretrial phase, various defendants sought clarification of the facsimile claim. Peter Shukat's interrogatories thus asked plaintiff to "identify and describe any and all authentic documents that plaintiff relied upon to evidence the forgeries and/or fraudulent alterations." In a response signed by LeFlore and dated April 22, 1985, Calloway, in an apparent but confusing attempt to distinguish between "forgeries" and "affixations of facsimiles," stated that:

> Plaintiff has never alleged any forgery of plaintiff's signature, nor is it alleged that any defendant, or defendants, fraudulently altered any document bearing any reasonable relationship to any document plaintiff ever executed on his own behalf or on behalf of Netta Productions, Inc.

> Paragraphs 51 through 53 and paragraph 55 of the amended complaint state as follows: [restate ¶¶ 51–53, 55 of amended complaint].

> \* \* \* \* \* \*

> Until plaintiff is provided discovery of the facts in this action, by oral testimony and further verification of the absence of any basis for authentication by defendant of relevant documents, plaintiff cannot now answer further in this regard, except specifically states that Peter Shukat was then the only person with access to, or ability to provide the other defendants, such facsimiles from the documents actually signed by plaintiff on or about June 8, 1981, and refers to those documents presently held under seal by the United States District Court, Southern District of New York, which evidence the affixation of a facsimile of plaintiff's sig-

nature thereto, and evidence defendants' fraudulent intent in respect thereto.

Answers and Objections of Plaintiff Northern J. Calloway to Defendant Peter Shukat's Interrogatories at 4–5. Moreover, one of Calloway's answers to Luis Quiros's interrogatories, signed by LeFlore and sworn to by Calloway on June 3, 1985, stated that the original documents "evidence the affixation of a facsimile of plaintiff's signature thereto." The answer also asserted once again that "[p]laintiff did not sign such documents."

Calloway's deposition was taken in June 1985. His testimony regarding the facsimile claim was hardly clear, but he did unmistakably state that part of that claim involved the existence of signatures that "imitated" his signatures. He failed, however, to provide an evidentiary basis for that claim. For that basis, Calloway relied upon his inability to recognize his signature, Peter Shukat's possession of the documents after their execution, and, disturbingly, his, Calloway's, belief, that a handwriting expert whom he did not know had informed LeFlore that the contracts bore "improperly affixed facsimile signatures." LeFlore knew at the time of this deposition that Tytell had *not* supported the facsimile claim.

Peter Shukat, who was alleged in the facsimile claim to have committed felonious acts that, if true, would more than justify disbarment, sought unsuccessfully during the pretrial stage to obtain the withdrawal of paragraph 52 of the amended complaint. In a June 21, 1985 letter, his counsel wrote to LeFlore that Rule 11 sanctions would not be sought for the facsimile claim if it was withdrawn. Similarly, in a July 12, 1985 letter, the same counsel sent an opinion from Paul Osborn, a handwriting expert, to all counsel indicating that Calloway's signatures were in fact genuine.

Notwithstanding the opinions of Tytell and Osborn and the reliance of Calloway on an expert's opinion that was never given, LeFlore persisted in asserting the facsimile claim. Calloway's proposed pretrial order, signed by LeFlore, thus restated the allegation in the amended complaint that Peter Shukat "improperly affixed a facsimile of plaintiff's signature to a series of documents." No reference was made to a white-out claim or any variation thereof. At the final pretrial conference, one week before the start of the trial, counsel for Marvel asked that LeFlore clarify the facsimile claim. He stated:

> At different times, Mr. Calloway has said, yes, that's my signature, and other times he has said no, that's not. Mr. LeFlore at times has said, we are claiming forgery, and at other times he has said we are not. They sometimes say, that's a facsimile signature, whatever that means, and at other times they said no.

The district court thereupon explicitly directed LeFlore to "state the document as to which you claim there is an irregularity and what the irregularity is." In a letter amendment to plaintiff's pleadings and contentions submitted by Pavelic & LeFlore on April 1, 1986 and signed by Raymond L. Levites, now LeFlore's co-counsel for trial purposes, Calloway abandoned the facsimile claim by not mentioning it. The letter stated:

> The irregularities with reference to the agreements effected by and at the direction of defendant Peter Shukat included physical separation and manipulation of the pages of the agreements to which plaintiff's signature had been affixed, and the alteration of the signature pages after plaintiff had signed them by obliterating one or more words with white-out, by retouching plaintiff's signature, a portion of which had been covered, and the insertion of the signatures of defendant Klein, without plaintiff's knowledge, consent or expectation of any such changes.

> Thereafter, Peter Shukat released the June, 1981 agreements without compliance with his undertaking to safeguard them pending Calloway's approval.

> Defendant Peter Shukat did all of the foregoing, aided and abetted by the other defendants, both to defraud Calloway and to misappropriate THE SKYRIDER.

\* \* \* \* \* \*

Plaintiff signed these documents only because defendant Peter Shukat intentionally misrepresented to him that he was obligated to do so and had no choice in the matter.

This letter thus raised for the first time the white-out claim, which asserted that the contracts in question had indeed been signed by Calloway but that the text had been altered by white-out and separation or manipulation of the pages. Because the use of white-out is obvious on the originals, LeFlore and Calloway must have seen the "alterations" at the time of the filing of the amended complaint some two and one-half years before but had never raised them as an issue. In addition, the separation and manipulation of pages, if it happened, occurred before making the photocopies attached to the original complaint but also was never raised. Moreover, the claim that oral misrepresentations by Peter Shukat had caused Calloway to sign the June 8 agreements had also not been made in the preceding three years and three months of litigation. The letter thus revolutionized Calloway's claims, fully justifying the defendants' view that they had been subject to moving-target litigation.

The case was tried before a jury from April 7, 1986 through May 13, 1986. Eighteen witnesses and about 250 exhibits provided the evidence. In a portion of his deposition read at trial, Calloway stated that he understood the term facsimile sig-

nature to mean "a signature placed on one document and then put on to another document" or signatures that "imitate my signatures." On cross-examination, Calloway agreed that he had "no real evidence" other than what LeFlore had told him that Peter Shukat had "forged" his signature or "placed a facsimile signature" on the agreements in question. Calloway was referring to his deposition testimony that LeFlore told him that a handwriting expert had concluded that facsimile signatures had been improperly affixed to the contracts.[4] In addition, there was substantial evidence that Calloway was mentally ill and had engaged in bizarre behavior unconnected to the litigation.

Although the facsimile claim was not pursued at trial, Calloway did introduce evidence designed to show that Peter Shukat had altered or manipulated the text of the June 8, 1981 agreements with white-out. The purpose of this evidence was to show that the agreements had been signed by Calloway only on behalf of Netta and therefore that Scott Shukat did not have authority to extend the option in September 1981. Central to the case, however, was the eleventh hour claim of oral misrepresentations by Peter Shukat.

At the close of Calloway's case, defendants moved for a directed verdict on all of the claims against them. Despite "serious reservations" about many of the claims,

---

**4.** His testimony reads as follows:

Q. You have no real evidence to believe that Peter Shukat forged your signature, do you?
A. [Calloway] I have the, I only have the evidence that the—
Q. Please answer the question, yes or no.
MR. LEFLORE: Objection, your Honor.
THE COURT: Overruled.
Q. Yes or no?
A. No.
Q. And you have no real evidence to believe that he placed a facsimile signature of yours on the June 8, 1981 contract documents, do you?
MR. LEFLORE: Your Honor, would you instruct the witness as you did yesterday.
THE COURT: No.
A. Yes.
Q. And you have no real evidence to believe that he contrived the June, 1981 contract documents.
A. Yes, I do.

Q. You have no real evidence to believe that other than what Mr. LeFlore told you, true?
A. No.
Q. Do you recall giving these sworn answers to these questions in this courthouse on June 13, 19[85] ...
　　＊　＊　＊　＊　＊　＊
"Q. Did a handwriting or document examiner ever confirm to you your claim or contention that the documents attached to Shukat 3 bear improperly affixed facsimile signatures of yours?
"A. Not to me, no.
"Q. To anyone?
"A. Yes.
"Q. Who?
"A. Mr. LeFlore."
　　＊　＊　＊　＊　＊　＊
Q. Was that your sworn answers to my questions in this courthouse on June 13, 1985?
A. Yes, they were.

Judge Sweet denied the motion except for the claim that Peter Shukat had fraudulently altered or manipulated the June 8 agreements. As to that claim, he found that "[t]here is no evidence, as far as I am concerned, to show any impropriety or anything that [Shukat] did with respect to those documents that would constitute any kind of a fraud." At the close of their case, the defendants again moved for a directed verdict, and Judge Sweet reserved decision on this motion. At that time, he reiterated that he would "not submit to the jury any claim based on forgery, facsimile, obliteration of documents or alteration of documents because I don't believe that there is any evidence in this record sufficient for that purpose as against any of the defendants."

The jury rendered a verdict rejecting Calloway's claims. This verdict was hardly surprising in light of what Judge Sweet described as "the overall insubstantiality of Calloway's copyright action." 111 F.R.D. at 648. In addition to weaknesses described earlier, there was no evidence that the Marvel presentation was the cause of the failure to obtain financing for the film, the only source of compensatory damages. LeFlore retained an expert on damages only shortly before trial, but the expert's testimony "failed to provide any basis upon which actual damages could be calculated." *Id.* at 644. Indeed, the district court suggested that had the jury returned a verdict in Calloway's favor, no damages would have been allowed. *See id.* at 644–45 ("there never was any factual basis for any specific damages, nor any objective proof of causation"). Moreover, again to quote the district court, "there was little evidence regarding any intent of the defendants to misappropriate Calloway's copyright." *Id.* at 645. In particular, there was no evidence of a purported conspiracy among Marvel, Galton, Brodax and the Shukats to infringe Calloway's copyright. According to the district court, "[n]o circumstantial

evidence was presented to indicate that either of the Shukats sought to engage in joint action with the other defendants. Indeed, the copyright claims against them were dismissed on this basis." *Id.* at 648.

After trial, the defendants sought sanctions from Calloway and LeFlore individually and from LeFlore's firm, Pavelic & LeFlore. Their motions were based on a claim that each of Calloway's allegations, including the facsimile claim, were at all times baseless. Their claim that they had paid in excess of $900,000 in attorney's fees to defend the litigation was undisputed.

Pavelic & LeFlore continued to represent Calloway in opposing the motions for sanctions, even though some aspects of the motions raised the issue of the relative responsibility of Calloway and LeFlore for conduct, if any, that violated Rule 11. The conflict of interest was of course most aggravated with regard to the facsimile claim, which Calloway had testified was based on his understanding of what a handwriting expert had told LeFlore. Neither Calloway nor LeFlore submitted an affidavit in opposition to the motions for sanctions, leaving all factual issues to be decided on the existing record. The brief submitted by Pavelic & LeFlore (signed by LeFlore) ignored the fact that sanctions were being sought for the facsimile claim, to which a single, oblique reference was made in a footnote, as well as for other claims. LeFlore's oral argument also ignored the facsimile claim and focused largely on the proposition that sanctions should not be imposed simply because the jury found against Calloway. Of course, the facsimile claim never went to the jury, and this argument was of no relevance as to it.

Judge Sweet issued a lengthy decision on August 1, 1986, *see* 111 F.R.D. 637 (S.D.N.Y.1986), in which he denied the Rule 11 motions for sanctions as to every aspect of the case but the facsimile claim.[5] As to

---

5. In limiting sanctions to the facsimile claim, Judge Sweet rejected the defendants' argument that Calloway's entire action was frivolous. The defendants, for example, claimed that Calloway's copyright infringement claim was friv-

olous because of a lack of evidence that Calloway's copyrighted script was used in preparing the Marvel presentation, only that material from the Roth synopsis was used. Judge Sweet determined that this was a nonfrivolous issue of

that claim, he imposed $100,000 in Rule 11 sanctions against Calloway. After noting that Calloway gave testimony that was not consistent with previous statements under oath but that he "may have been unaware of the consequences of his statements," Judge Sweet concluded that "Calloway's inability to give consistent and forthright testimony resulted from his willingness to follow his attorney's advice rather than his own intent to misrepresent the facts." *Id.* at 649–50. Judge Sweet imposed a separate judgment of $100,000 in Rule 11 sanctions on Pavelic & LeFlore on the ground that the facsimile claim never had a reasonable basis. *Id.* at 651.

Judge Sweet also imposed $23,000 in sanctions against Pavelic & LeFlore pursuant to 28 U.S.C. § 1927 for failing to accept an offer of settlement from Quiros, *id.* at 649, 652, and $10,000 in sanctions to be paid by Calloway under 17 U.S.C. § 505 of the Copyright Act, which provides that "the court in its discretion may allow the recovery of the full costs by or against the party ... [including] a reasonable attorney's fee to the prevailing party as part of the costs." *Id.* at 652.

Two weeks later, the firm of Pavelic & LeFlore was dissolved. Radovan Pavelic then made a Fed.R.Civ.P. 60(b) motion to relieve the firm of the various sanctions. At that time, both Pavelic and LeFlore withdrew as counsel for Calloway because they had now discovered that a conflict of interest existed regarding the motions for sanctions. Judge Sweet granted the Rule 60(b) motion in part and allocated the $100,000 in Rule 11 sanctions equally between the firm and LeFlore, because the firm entered the litigation only in October 1984. *See* 650 F.Supp. 684, 688 (S.D.N.Y.1986).

LeFlore sought a stay pending appeal of the judgment awarding sanctions. In support of his motion, he submitted an affidavit that, astonishingly enough, asserted that the facsimile claim had never been made. He thus stated,

fact because copying from a prior draft of a copyrighted work could be copyright infringement. 111 F.R.D. at 645–46. He also ruled that Calloway's claims regarding the Shukats' mis-

While the document tampering allegation developed over time as plaintiff and I were made aware of new evidence, the essence of our position on the authenticity of the agreements was, from beginning to end, not that Calloway's signature was imitated by another person (although Calloway himself sometimes could not identify certain signatures as his) but that the contracts had been altered, manipulated and forged (in the sense of altered) after being signed.

## DISCUSSION

### 1. *The Sanctioned Conduct*

Because LeFlore takes the position that the facsimile claim was never made and that sanctions were imposed only for "document tampering," language that he implies refers only to the white-out claim, we must define with specificity the exact conduct that was the basis for imposing sanctions. In that regard, Judge Sweet stated:

Calloway opposed the summary judgment motion in April, 1984 by claiming that he did not sign the Option Agreement and that it was improperly extended by an extension agreement prepared in September, 1981....

As to the first of these claims, it is now apparent that there was no basis in fact for Calloway's assertions and insufficient inquiry by his counsel. Calloway's statement that he did not sign the Option Agreement inserted into the actions the issues of forgery, manipulation and facsimile signature which created smokescreens during the subsequent two years of discovery....

[T]he basis for Calloway's forgery and facsimile claim should have been known at the time it was originally asserted. It is apparent now that Calloway himself had no basis to make that claim, since he admitted at trial that the evidence regarding this issue was developed by his attorney and not from his personal knowledge of his signature or his ac-

representations and the meaning of the writer's agreement did not call for Rule 11 sanctions. *Id.* at 648.

tions. Calloway further stated that he was unable to determine for sure whether his signatures were authentic. On the other hand, counsel for Calloway had not yet consulted any expert at the time of the summary judgment motion, and even when an expert was obtained, no material evidence of forgery or facsimile was discovered.

Given the admitted absence of any affirmative evidence from either the signatory o[r] the documents that Calloway's signature was not genuine, it is inconceivable that this allegation could have been made in accordance with the obligations imposed by Rule 11. Instead it appears that in their ambition to maintain this action, Calloway and counsel allowed his inconclusive inability to recognize his signature to be translated into a conclusive denial of his signature. When the central basis for opposing summary judgment is proffered on such an insignificant foundation, Rule 11 sanctions are appropriate.

111 F.R.D. at 646–47 (footnote omitted). Moreover, Judge Sweet explicitly distinguished the white-out claim from the facsimile claim in a footnote:

> The other document manipulation claims asserted by Calloway were raised only after it became apparent that forgery or facsimile signature allegations could not be pressed any further. These evolving claims regarding white-outs, additions of another party's signature and alleged removal were so insignificant and immaterial that they were eventually dismissed by the court.

*Id.* at 647 n. 2.

On appeal, LeFlore's counsel continues to play the hand dealt by LeFlore's affidavit supporting the motion for a stay and argues that Calloway never advanced the facsimile claim but asserted only that the text of the documents was altered by white-out after he signed them. His brief on this appeal thus states:

> The District Court's opinion imposing sanctions proceeds as though Calloway's allegation at the time of the summary judgment motion and until shortly before trial had been that his signature had been imitated on the June 1981 Agreements, and that the evidence at trial provided no support for such an allegation. This is simply incorrect. Although Calloway often had trouble recognizing his signature and sometimes denied that certain signatures were his, the position being asserted in court was from beginning to end, as LeFlore has said, that the documents had been altered after Calloway signed them.

Brief for Appellant–Cross–Appellee Ray L. LeFlore at 30–31. Simply put, that statement is incorrect. That LeFlore repeatedly claimed that Calloway's signature had been "imitated" is irrefutably evidenced by the following:

(1) Paragraph 52 of the amended complaint, filed August 31, 1983, alleged that "[o]n or about August 5, 1981 without plaintiff's knowledge or consent, Peter Shukat improperly affixed a facsimile of plaintiff's signature to a series of documents, back-dated to June 8, 1981....";

(2) LeFlore's memorandum of October 19, 1983 in opposition to a motion to dismiss restated Paragraph 52 of the amended complaint;

(3) Calloway's affidavit in opposition to a motion for summary judgment, written by LeFlore, restated Paragraph 52 of the amended complaint, stated that the documents had been "forged," and further stated that Calloway had "neither signed nor approved" the documents;

(4) LeFlore's memorandum of law in opposition to the motion for summary judgment stated that Calloway had "neither signed nor approved the agreements";

(5) LeFlore's reply memorandum in opposition to the Marvel defendants' motion for summary judgment stated that the documents "were forged" and "signed by others" and that "defendants' only recourse is to claim-over against those individuals who either forged plaintiff's signature or represented they were authorized to sign for him." These statements cannot be read as anything but challenges to the genuineness of Calloway's signatures.

(6) Calloway's answers to Peter Shukat's interrogatories restated Paragraph 52 of the amended complaint, stated that Peter Shukat had access to "facsimiles from the documents actually signed by plaintiff," and further stated that the original documents provided by defendants "evidence the affixation of a facsimile of plaintiff's signature thereto";

(7) Calloway's answers to Quiros's interrogatories repeated the "evidence the affixation of a facsimile of the plaintiff's signature" and stated that "[p]laintiff did not sign this document."

(8) LeFlore's belated retention of a handwriting expert to examine, *inter alia*, the signatures on the contract is inexplicable unless he was claiming forgery. Moreover, in July, 1985, counsel for Peter Shukat sent LeFlore a letter containing an opinion from another handwriting expert opining that Calloway had signed the agreements and urging that the facsimile claim be withdrawn. If LeFlore was not challenging the genuineness of Calloway's signatures, a response denying that he was making such a claim was clearly called for. No response was made.

(9) Calloway stated in a deposition that the word facsimile meant that the signatures on the contracts "*imitate* my signatures" (emphasis added).

(10) Calloway's proposed pretrial order of March 25, 1986 restated the allegations of Paragraph 52 of the amended complaint that Peter Shukat "improperly affixed a facsimile of plaintiff's signature to a series of documents."

The foregoing amply demonstrates that the claim in LeFlore's brief that he never alleged that plaintiff's signature had been "imitated" is as baseless as was the facsimile claim itself.

### 2. *Rule 11 Sanctions and the Facsimile Claim*

Rule 11, as amended, requires that "[e]very pleading, motion or other paper of a party represented by an attorney shall be signed" by the attorney. It then provides that:

The signature of an attorney or party constitutes a certificate by the signer that the signer has read the pleading, motion, or other paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

The 1983 amendment to Rule 11 was intended to "discourage dilatory or abusive tactics and help to streamline the litigation process by lessening frivolous claims or defenses." Fed.R.Civ.P. 11 advisory committee's note to 1983 amendment. *See generally* Schwarzer, *Sanctions Under the New Federal Rule 11—a Closer Look,* 104 F.R.D. 181 (1985); Symposium, *Amended Rule 11 of the Federal Rules of Civil Procedure,* 54 Ford.L.Rev. 20 (1985).

We first addressed the meaning of the revised rule in *Eastway Construction Corp. v. City of New York,* 762 F.2d 243 (2d Cir.1985) ("*Eastway I*"), cert. denied, — U.S. —, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987), where we held that the new phrase "formed after a reasonable inquiry" imposed an objective test replacing former Rule 11's subjective standard, under which an attorney's "good faith" belief in the "viability" of a pleading or paper provided a "safe harbor" from sanctions. *Id.* at 253. Under the objective standard, district courts should impose sanctions whenever a pleading has been

interposed for any improper purpose, *or where,* after reasonable inquiry, a competent attorney could not form a reasonable belief that the pleading is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law.

*Id.* at 254. In framing this standard, we were concerned lest sanctions stifle creative legal argument and therefore stated that courts should avoid hindsight and re-

solve all doubts in favor of the signer. *Id.* At the same time, we added that Rule 11 is violated "where it is patently clear that a claim has absolutely no chance of success under the existing precedents...." *Id.*

*Oliveri v. Thompson,* 803 F.2d 1265 (2d Cir.1986), *cert. denied,* 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987), established that Rule 11 applies to all papers filed in a lawsuit and that the signer's conduct should be judged at the time the paper is signed. We held also that Rule 11 does not impose a continuing obligation on the signer to correct or withdraw papers previously filed. *Id.* at 1274–75.[6] We further noted that Rule 11 sanctions may not be imposed where an attorney has an objectively reasonable basis to pursue a factual claim. *Id.* at 1277.

■ In considering sanctions regarding a factual claim, the initial focus of the district court should be on whether an objectively reasonable evidentiary basis for the claim was demonstrated in pretrial proceedings or at trial. Where such a basis was shown, no inquiry into the adequacy of the attorney's pre-filing investigation is necessary. If no reasonable evidentiary basis for a factual claim was disclosed in pretrial proceedings or at trial, the district court must then scrutinize the objective reasonableness of the attorney's pre-filing inquiry and the basis for the claim developed by that inquiry. If the inquiry was objectively reasonable under the circumstances and disclosed a reasonable factual basis for the claim, then sanctions are not appropriate. On the other hand, if the attorney either failed to make an objectively reasonable inquiry or pursued a claim for which no basis was disclosed by such an inquiry, then sanctions are appropriate.

■ We now turn to whether Judge Sweet properly imposed sanctions for the facsimile claim. We review that decision de novo. *Eastway I,* 762 F.2d at 254 n. 7

("Where the only question on appeal becomes whether, in fact, a pleading was groundless, we are in as good a position to determine the answer and, thus, we need not defer to the lower court's opinion."). However, factual findings underlying the imposition of sanctions are reviewed under the clearly erroneous standard. *See* Fed.R. Civ.P. 52(a).

■ It is now beyond dispute that the facsimile claim was never supported by any evidence at any stage of the proceeding. Having determined that the facsimile claim on its face was never grounded in fact, we turn to the objective reasonableness of LeFlore's pre-filing inquiry. The Advisory Committee's Note states that

> what constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading ...; or whether he depended on forwarding counsel or another member of the bar.

Fed.R.Civ.P. Rule 11 advisory committee's note to 1983 amendment.

■ An attorney is entitled to rely on his or her client's statements as to factual claims when those statements are objectively reasonable. In *Kamen v. American Telephone & Telegraph Co.,* 791 F.2d 1006 (2d Cir.1986), we reversed the district court's award of sanctions, holding that the attorney's reliance on his client's statements—that the client's employer received federal grants for its work for the military, thereby subjecting the employee to the requirements of the Rehabilitation Act—was reasonable under the circumstances because "the relevant information was largely in the control of defendants." *Id.* at 1012. Moreover, in *Oliveri,* we ruled that an attorney made a reasonable investigation prior to filing a civil rights suit for an allegedly unconstitutional arrest when he interviewed his client, and obtained and

---

6. Other circuits have decided some of these issues differently. The Fifth Circuit has held that an attorney has a continuing obligation to update papers previously filed. *See Robinson v. Nat'l Cash Register Co.,* 808 F.2d 1119, 1127 (5th Cir.1987) (citing *Southern Leasing Partners v.*

*McMullan,* 801 F.2d 783, 788 (5th Cir.1986)), while the Seventh Circuit has ruled that Rule 11 analysis has a subjective component. *See Szabo Food Serv. Inc. v. Canteen Corp.,* 823 F.2d 1073, 1083 (7th Cir.1987).

reviewed police and court records. 803 F.2d at 1276–78.

In both *Kamen* and *Oliveri,* the sanctioned attorney submitted an affidavit to the district court recounting the pre-filing inquiry. *See Kamen,* 791 F.2d at 1009; *Oliveri,* 803 F.2d at 1268–69. By contrast, LeFlore never submitted an affidavit to the district court describing a pre-filing inquiry. That fact alone strongly suggests that no inquiry was made.

Nevertheless, given the seriousness of this matter, we take note of the statement by LeFlore's appellate counsel at oral argument that the facsimile claim was based on LeFlore's "interpretation of what his client told him," namely that Calloway told LeFlore that he had not signed the agreements in his personal capacity but only on behalf of Netta.[7] Even if the statement at oral argument by LeFlore's counsel is treated as a sworn statement by LeFlore, the statement is still no evidence that Calloway told LeFlore that he, Calloway, believed that Peter Shukat had affixed a facsimile of his signature to the relevant documents. Indeed, at trial, Calloway agreed that he never had "real evidence" for the facsimile claim other than *what LeFlore told him,* a reference to his deposition testimony that a handwriting expert had confirmed to LeFlore the improper affixation of a facsimile signature to the contracts. *See* note 4, *supra.* LeFlore has never disputed this version of events notwithstanding the fact that the expert he hired, contrary to Calloway's belief, did *not* support it.

At oral argument, LeFlore's counsel argued that the attorney-client privilege bars an attorney from raising the defense that he was misled by his client. We need not explore the precise role of the attorney-client privilege in Rule 11 proceedings, however, because Calloway has never sought to invoke it. If LeFlore believed that he had been misled by Calloway, he should have ceased representing him at the start of the Rule 11 proceedings and allowed Calloway to seek the aid of new counsel. Had LeFlore done so, Calloway could have decided whether or not to invoke the privilege, and the issue would have been properly posed. No such steps were taken here. Moreover, LeFlore's claim on this appeal is not that Calloway misled LeFlore but that LeFlore unaccountably created the facsimile claim out of Calloway's statement that he had signed the documents only as an officer of Netta and not in his personal capacity. That statement is hardly an objectively reasonable basis for the facsimile claim.

The record demonstrates beyond argument LeFlore's indifference to whether the facsimile claim had a factual basis. When the original documents (textually identical to the exhibits to the original complaint) were produced by the defendants, they contained several minor changes involving the obvious use of white-out, which the district court quite properly deemed "insignificant and immaterial." 111 F.R.D. at 647 n. 2.[8]

---

7. At oral argument, the following colloquy occurred:

NEWMAN, J.: What the complaint says is, on or about August 5, without plaintiff's knowledge, Shukat "improperly affixed a facsimile of plaintiff's signature to a series of documents." That's what it says.
MR. PIEL: That's what it says. An awkward and inept way ...
NEWMAN, J.: [Can] we establish that's not so?
MR. PIEL: That's what it says, your Honor.
NEWMAN, J.: And is that not so?
MR. PIEL: That is not so.
NEWMAN, J.: It didn't happen.
MR. PIEL: It did not happen.
NEWMAN, J.: But, did the lawyer have any basis for thinking that that had happened, namely the improper affixing of a facsimile of plaintiff's signature to another document?

MR. PIEL: That was his interpretation of what [LeFlore's] client told him. And I think that the lawyer is entitled to a presumption that his client told him the same thing that he later told the court and jury under oath, which is that the only agreements I signed were agreements that I signed on behalf of Netta Productions, Inc.

8. He further found that these changes were "within the customary practice in such an undertaking." *Id.* at 644. For example, the word "by" next to Calloway's name on the signature page of the writer's agreement was whited-out after he signed this agreement in order to permit the addition of Klein's signature. The word "Writer" was then moved down one line so as to be parallel with Calloway's signature. Similarly, the word "Writer" replaced "Netta" throughout the agreement. The district court found

It is conceivable that a reasonable lawyer viewing these documents for the first time would conclude that an inquiry should be made into the alterations. However, nothing on the face of these documents suggests the affixation of a facsimile signature or forgery.

LeFlore did not retain a handwriting or document expert until November 1984, more than one year after he signed the amended complaint and more than six months after writing the affidavit for Calloway stating that the signatures on the agreements were not genuine and filing other papers saying the contracts were "forged" and "signed by others." This expert, Pearl Tytell, compared the original set of documents with several checks bearing five of Calloway's genuine signatures. On the basis of this examination, she told LeFlore that all the agreements were "probably" signed by the same person and "possibly" by the signer of the checks. At trial, she testified that she *never* considered the signatures on the June 8 agreements to be facsimile signatures, nor did she know of any evidence that they were not genuine. Calloway's deposition was taken after Tytell had made an oral report to LeFlore. When Calloway stated in that deposition that he was relying upon an expert's opinion to support the facsimile claim, LeFlore knew that no such opinion existed and that the expert actually refuted the claim. Nevertheless, LeFlore declined to drop the claim.

Finally, we note that Calloway's testimony regarding the facsimile claim was inconsistent and sometimes unintelligible and that he may have been mentally ill. These facts hardly justify pursuit of the facsimile claim, however. A reasonable attorney would not pursue a claim of forgery based on such equivocal evidence from such an untrustworthy source. A sensitivity to an attorney's obligation not to press baseless claims would call for caution in such circumstances rather than the headlong and heedless pursuit of a claim of the most serious misconduct by another attorney.

■ LeFlore's indifference to the existence of a factual basis for the facsimile claim is not cured by Levites's April 1, 1986 letter to the district court abandoning that claim. Under *Oliveri*, the conduct of a signer of a pleading, motion or paper is judged as of the time that the signature is affixed, not later. 803 F.2d at 1274. An attorney cannot be sanctioned therefore for failing to withdraw a claim that later proves to be groundless, provided that the attorney: (i) conducted a reasonable pre-filing inquiry demonstrating a reasonable basis for the claim at the time it was made; (ii) did not subsequently restate the claim after learning that it was groundless; or (iii) did not decline to withdraw it upon an express request by his or her adversary after learning that it was groundless. However, an attorney who does not undertake such an inquiry cannot avoid Rule 11 sanctions by later withdrawing a groundless claim. By that time, the damage has been done.

■ We also reject LeFlore's argument that the district court's denial of the Marvel defendants' motions under Rule 56 for summary judgment shield him from the imposition of sanctions. To the contrary, the denial of the motions is one basis for the sanctions. As Judge Sweet noted in imposing sanctions, plaintiff's "central basis for opposing" summary judgment was Calloway's affidavit stating that the documents had been forged by Peter Shukat's affixing a facsimile of Calloway's signature to them. 111 F.R.D. at 647. When he denied the motions for summary judgment on the basis of the facsimile claim as stated in Calloway's affidavit, Judge Sweet warned that sanctions would be imposed if the claim was baseless. *Id.* at 642.

■ It is hornbook law that a district court "cannot try issues of fact on a Rule 56 motion but only is empowered to determine whether there are issues to be tried," and that "[g]iven this function, the district court examines the affidavits or other evidence introduced on a Rule 56 motion sim-

that "[t]he signing of certain documents by Calloway as an officer of Netta was virtually a

clerical oversight of inconsequential importance." *Id.*

ply to determine whether a triable issue exists rather than for the purpose of resolving that issue." 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure* § 2712, at 574–75, 578 (1983). It is thus entirely possible that a baseless factual claim will survive a motion for summary judgment, particularly where an attorney prepares an affidavit for a client stating a material fact for which there is no basis. Where baseless allegations are used to prevent summary judgment, sanctions are mandatory if the attorney did not make a reasonable pre-filing inquiry when he or she originally put forward the claim. Rule 11's purposes would be ill-served by any other rule. *See* Note, *Plausible Pleadings: Developing Standards for Rule 11 Sanctions*, 100 Harv.L.Rev. 630, 635 (1987) ("[B]ecause groundless factual allegations are difficult to uncover prior to trial, there is a danger that a lawyer seeking to extort a settlement might file pleadings based on a fabricated factual dispute. Rule 11 attempts to eliminate this danger by providing for sanctions against lawyers who press bad claims through gaps in other pretrial screening devices.") (footnotes omitted).[9] Accordingly, pursuit of the facsimile claim justifies the imposition of Rule 11 sanctions.

### 3. *Rule 11 Sanctions Against Calloway*

Calloway appeared pro se on his appeal. He asked that we appoint counsel to represent him but failed to file an affidavit of indigency as requested. Because he thereafter filed no papers, his appeal was automatically dismissed by the clerk for failure to prosecute under our Civil Appeals Management Plan. For reasons stated immediately *infra*, we are *sua sponte* recalling the mandate and reinstating Calloway's appeal in order to remand for a determination of the relative responsibility of Calloway and his attorneys for the conduct violating Rule 11 and the allocation of sanctions between them.

The entire Rule 11 proceeding against Calloway was thoroughly tainted by Pavelic & LeFlore's representation of him notwithstanding a self-evident conflict of interest. The motions for sanctions explicitly relied, *inter alia*, upon the facsimile claim. With regard to that claim, Calloway had agreed at trial that he had no "real evidence" other than what LeFlore had told him, namely that a handwriting expert had supported the claim that facsimile signatures were improperly affixed to the contracts. This testimony alone clearly raised an issue as to whether Calloway or LeFlore, or both, were responsible for the

---

**9.** LeFlore also claims that Rule 11 sanctions should not be imposed "when based on one allegation in support of claims that were supported by other independent allegations." For that proposition, LeFlore relies upon *Golden Eagle Distributing Corp. v. Burroughs Corp.*, 801 F.2d 1531 (9th Cir.1986). In that case, the district court had imposed sanctions on defense counsel who had made a concededly good faith argument for extension of the law, but had described that argument as if it were existing law. In reversing, the Ninth Circuit held that Rule 11 does not require counsel to engage in such "argument identification." *Id.* at 1539–40. The court further stated in dicta that:

> Moreover, Rule 11 does not apply to the mere making of a frivolous argument. The Rule permits the imposition of sanctions only when the 'pleading, motion, or other paper' itself is frivolous, not when one of the arguments in support of a pleading or motion is frivolous. Nothing in the language of the Rule or the Advisory Committee Notes supports the view that the Rule empowers the district court to impose sanctions on lawyers simply because a particular argument or

ground for relief contained in a non-frivolous motion is found by the district court to be unjustified. In short, the fact that the court concludes that one argument or sub-argument in support of an otherwise valid motion, pleading, or other paper is unmeritorious does not warrant a finding that the motion or pleading is frivolous or that the Rule has been violated.

*Id.* at 1540–41.

*Golden Eagle*, however, dealt with a legal rather than, as here, a factual claim. Moreover, the facsimile claim was no minor sub-claim in an otherwise well-and-independently grounded claim. *Cf. Oliveri*, 803 F.2d at 1280 (sanctions not warranted in civil rights case for "boilerplate" allegations that were not given "serious consideration" by defendants thereby rendering any technical violation of Rule 11 "*de minimis*"). The facsimile claim was in fact "the central basis for opposing summary judgment," 111 F.R.D. at 647, and was an "ill-advised attempt to bolster an otherwise weak case." *Id.* at 648. Moreover, a claim of forgery against a defendant attorney cannot be ignored but must be vigorously defended.

conduct Judge Sweet found violative of Rule 11. Unless LeFlore was prepared to inform Judge Sweet that he had in fact put words in Calloway's mouth in preparing the amended complaint, the affidavit opposing the motions for summary judgment and various answers to interrogatories, and that he thereafter misrepresented to Calloway Tytell's opinion on the matter, he should have ceased to represent Calloway in the Rule 11 proceedings. *See Eastway v. City of New York*, 637 F.Supp. 558, 570 (E.D.N.Y.1986) (when there is question as to whether client or attorney is at fault, interests of two become adverse and client will need new counsel to represent him). Instead, his firm, from which the defendants were also seeking sanctions, continued to represent Calloway, submitting a brief (signed by LeFlore) devoted almost exclusively to issues that had been submitted to the jury, making only a single, oblique reference to the facsimile claim in a footnote. Of course, no argument was made to the court that LeFlore and the firm bore full responsibility for the facsimile claim. In particular, the extent to which LeFlore pressed the facsimile argument upon Calloway, including a misrepresentation as to an expert's opinion, was not explored. Nor was it argued that, even if Calloway bore some responsibility for the claim, LeFlore and the firm should be jointly and severally liable for sanctions imposed on Calloway.

The district court imposed $100,000, fifty percent of the total sanctions, upon Calloway, an amount for which the attorneys are not jointly and severally liable. In imposing sanctions, however, Judge Sweet stated that Calloway may not have been aware of the consequences of his statements and was prone to substitute his attorney's theories for the facts. He thus stated that Calloway did not knowingly lie in the affidavit that was written by LeFlore and that Calloway had not acted in bad faith. 111 F.R.D. 649–50. Moreover, the position taken by LeFlore at oral argument in this court is that LeFlore unaccountably misinterpreted what Calloway told him regarding Calloway's signing only in his capacity as a corporate officer.

In imposing sanctions, Judge Sweet appears to have applied an "objectively reasonable" test to Calloway's conduct. That test, however, is appropriate only in evaluating the conduct of attorneys under Rule 11, not the conduct of parties represented by attorneys. As licensed professionals and officers of the court, attorneys are expected to measure up to minimal standards of professional competence under the Rule and thus may not excuse their conduct on the ground that they were acting in good faith. *Eastway I*, 762 F.2d at 253; *Eastway*, 637 F.Supp. at 566–67.

■ We believe that a party represented by an attorney should not be sanctioned for papers signed by the attorney unless the party had actual knowledge that filing the paper constituted wrongful conduct, *e.g.,* the paper made false statements or was filed for an improper purpose. The Advisory Committee stated that allocation of sanctions among attorneys and their clients was a matter of judicial "discretion" and that sanctions should be imposed on a party where appropriate under the circumstances. Fed.R.Civ.P. 11 advisory committee's note to 1983 amendment. As guidance, the Committee cited *Browning Debenture Holders Committee v. DASA Corp.*, 560 F.2d 1078 (2d Cir.1977), a case holding that a represented party should not be held liable for wrongful conduct by attorneys unless the party was personally aware of or responsible for the conduct.

■ We believe that where a represented party either did not knowingly authorize or participate in the filing of a paper that violated Rule 11, sanctions against that party are not appropriate. We further believe that when a party has participated in the filing of a paper signed by the attorney or has signed a paper himself but did not realize that such participation or signing was wrongful, then sanctions against the party are also not appropriate. In each of these cases, the attorney, because of professional standards, is held to know of the wrongfulness of the conduct and, because of professional responsibility, should act to prevent it. Where the attorney fails to advise an unwary client of the

wrongfulness of such conduct, the burden of sanctions should fall entirely upon the attorney. *See Quiros v. Colon,* 800 F.2d 1- (1st Cir.1986).

■■■■ Of course, where the party does know that the filing and signing is wrongful and the attorney reasonably should know, then sanctions against both are appropriate. Where a party misleads an attorney as to facts or the purpose of a lawsuit, but the attorney nevertheless had an objectively reasonable basis to sign the papers in question, then sanctions on the party alone are appropriate. *See Friedgood v. Axelrod,* 593 F.Supp. 395 (S.D.N.Y. 1984) (plaintiff lied to attorney).

■■ In the present case, Calloway's signing of the affidavit and answers to interrogatories were seriously wrongful. Judge Sweet, however, appears to have believed that Calloway's contacts with reality were so fragile that he may not have understood that swearing to the facsimile claim was culpable and may have been merely trying to accommodate LeFlore. Indeed, Judge Sweet stated that Calloway did not act in bad faith. 111 F.R.D. at 650. In such circumstances, the imposition of sanctions upon Calloway would be error. Had Calloway pursued his appeal, therefore, it is clear that the judgment against him would at the very least have been remanded. The only question, therefore, is whether Calloway's appeal should be reinstated and the mandate recalled. We believe it should.

Were Calloway now to file a motion to reinstate the appeal, we would certainly grant it. *Cf. Avlon v. Greencha Holding Corp.,* 232 F.2d 129 (2d Cir.1956) (after misunderstanding as to which of several attorneys would handle appeal, motion for leave to file brief granted more than three years after records had been filed). Fed.R. App.P. 2 clearly authorizes us to relieve litigants of the consequences of default "where manifest injustice would otherwise result." Fed.R.Civ.P. 2 advisory committee's notes. The potential of such an injustice clearly exists in the present case, and we believe that the appeal should be rein-

stated and the judgment against Calloway remanded.

The issue here is not simply the plight of a pro se appellant with a viable claim of error who abandons his or her appeal. The Rule 11 proceeding concerning Calloway was thoroughly tainted by his attorneys' failure to withdraw from representation at the start of the proceeding in which they had an adverse financial interest. *See generally* Code of Professional Responsibility Canon 5, N.Y.Jud.Law Appendix (McKinney 1975). The result was financially disastrous to Calloway and, because Calloway was found to be fifty percent responsible for the conduct violating Rule 11, benefited the attorneys. Because he was represented by attorneys with a clear conflict of interest, Calloway is not only likely to be unaware that he had a viable ground for appeal concerning his responsibility relative to that of LeFlore, but he may also believe that he is protected by LeFlore's appeal. Indeed, LeFlore's brief asks us to reverse the judgment against Calloway on the overstated grounds that the issues regarding the imposition of sanctions on him are identical to those raised by LeFlore. LeFlore's brief thus states:

> Calloway filed with this Court on September 16, 1986 a motion for appointment of counsel and for a stay of proceedings. That motion was denied on May 29, 1987 without prejudice to Calloway submitting an affidavit regarding his inability to retain counsel. Even if Calloway does not submit a brief, a decision by this Court in favor of LeFlore and Pavelic & LeFlore reversing the imposition of sanctions under Rule 11 should apply as well to the $100,000 Rule 11 sanction which was imposed against Calloway on the same grounds.

Brief for Appellant–Cross–Appellee Ray L. LeFlore at 7 n. 1. Calloway and LeFlore may share a common position as to the meritless argument that the facsimile claim was never made and therefore that no sanctions should have been imposed. Otherwise, however, the sanctions imposed on Calloway are based on a finding that he was jointly responsible with his attorneys for pursuit of the facsimile claim, a finding

not disputed by LeFlore's appellate brief. Moreover, if LeFlore's counsel believes that LeFlore's appeal protects Calloway, Calloway, being unaware of the conflict of interest, may also believe that LeFlore's appeal is a substitute for his own. The danger of a manifest injustice therefore exists, and we recall the mandate and reinstate Calloway's appeal.[10] On that appeal we vacate the $100,000 sanctions under Rule 11 and remand for a redetermination of Calloway's responsibility for the facsimile claim under Rule 11 and for other proceedings consistent with this opinion.

### 4. *Amount of Rule 11 Sanctions and Joint and Several Liability*

To reiterate, the district court imposed Rule 11 sanctions totalling $50,000 against LeFlore, and $50,000 against Pavelic & LeFlore. 650 F.Supp. at 688. The district court also imposed separate sanctions of $100,000 under Rule 11 against Calloway. LeFlore and the firm claim that Judge Sweet abused his discretion in awarding sanctions of this magnitude, while cross-appellants Marvel, Galton and Brodax seek an increase in their award.

As we noted in *Eastway I*, district courts have "broad discretion in fashioning sanctions," 762 F.2d at 254 n. 7, and we review such an award under the "abuse of discretion" standard. *Id.* In *Eastway I*, we remanded to the district court the task of imposing "appropriate sanctions," a sum to include "the amount of reasonable expenses incurred by" the defendants. *Id.* at 254. After Judge Weinstein awarded only $1,000 in sanctions, *Eastway Constr. Corp. v. City of New York*, 637 F.Supp. 558 (E.D. N.Y.1986), we modified the award to "the bottom of the range of discretion appropriate to this case" or $10,000. *Eastway Constr. Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir.) (*"Eastway II"*), cert. denied, —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). In *Eastway II*, we counseled that district courts should "care-

fully calibrate" the award of sanctions, and "award only that portion of a defendant's attorney's fee thought reasonable to serve the sanctioning purpose of the Rule." *Id.* at 122–23.

In imposing Rule 11 sanctions in the instant case, Judge Sweet considered "the gravity of the Rule 11 violation, the circumstances of the violation within the context of the case, and the financial resources of the respective parties." 111 F.R.D. at 651. He then stated that he

> regard[ed] the violation in this case to be a very serious breach of the obligations of an attorney to conduct a reasonable inquiry into the factual circumstances underlying a pleading or a motion, for this case could have been resolved at a much earlier stage if the baseless assertions of forgery and document manipulation had not been made.

*Id.* After noting that an award of $900,000, the defendants' aggregate attorney's fees, would be "extremely onerous," Judge Sweet determined that a sanction of $200,000 to be borne equally by Calloway and Pavelic & LeFlore was appropriate. *Id.* This amount represented approximately the average fee of the five defense counsel. *Id.*

Putting aside for the moment the question of allocating the sanctions among Calloway and his attorneys, we conclude that the total of $200,000 is not excessive. As we said in *Eastway II*, "[t]he concept of discretion implies that a decision is lawful at any point within the outer limits of the range of choices appropriate to the issue at hand; ..." 821 F.2d at 123. We entirely agree with Judge Sweet that pursuit of the facsimile claim, which amounted to an utterly baseless charge of forgery against a lawyer, was "a very serious breach" of Rule 11, 111 F.R.D. at 651, and a substantial sanction was appropriate. We cannot say therefore that Judge Sweet abused his discretion in awarding $200,000, an amount

---

**10.** We do not reinstate Calloway's appeal regarding the award of attorney's fees under 17 U.S.C. § 505. The conflict of interest did not affect this award since the statute specifically authorizes such an award only against a party,

and Calloway's good faith would not be a defense to such sanctions. *Diamond, v. Am–Law Publishing Corp.*, 745 F.2d 142, 148 (2d Cir. 1984).

approximating twenty percent of the defendants' attorney's fees of $900,000. In *Eastway II*, a reasonable attorney's fee under the lodestar method was $52,912.50, and we held that "the bottom of the range of discretion" for sanctions was $10,000. *Id.* at 122–23.

The propriety of the portion of the Rule 11 sanctions imposed on the attorneys, $100,000, is thus clear. Less clear, however, is the liability of the attorneys for the $100,000 imposed solely upon Calloway, and we now remand for consideration of that issue. If on remand Judge Sweet decides not to reimpose some or all of the $100,000 sanctions on Calloway, a question then arises under the cross-appeal as to whether the attorneys should be made liable for the amount from which Calloway is then relieved in light of the fact that a finding of diminished responsibility on Calloway's part appears to imply increased responsibility on the attorneys' part. Even if on remand Calloway remains liable for some or all of the sanctions, we believe a question exists as to the appropriateness of joint and several liability of the attorneys for that amount.

We believe these interrelated questions should be addressed as follows. We now affirm the $100,000 in sanctions imposed on the attorneys. On the remand that we have ordered in Calloway's reinstated appeal, Judge Sweet, applying the legal standards described above, should determine what portion, if any, of the $200,000 total sanctions is the responsibility of Calloway and impose either no sanctions on him or an appropriate amount between zero and the $100,000 originally imposed. If he revises the sanction against Calloway from the $100,000 originally imposed, he should then consider whether the attorneys should be liable for that portion of the $100,000 no longer outstanding as to Calloway. We believe this is an issue fairly raised by the Marvel defendants' cross-appeal that seeks, *inter alia,* an increase in the sanctions imposed on the attorneys. The issue must be remanded, however. Judge Sweet's balancing of the numerous pertinent factors has now been undone by our remand of Calloway's appeal, and Judge Sweet should

determine in the first instance the appropriate total mix of sanctions (in addition to the $100,000 affirmed) in the proceedings on remand.

■ We also remand the issue of the attorneys' joint and several liability for amounts owed by Calloway, if any, after remand. We do so because Judge Sweet gave no reason for entering entirely separate judgments and may have believed that such judgments were required by the district court's decision in *Eastway.* The district court stated there that clients may not reimburse lawyers for Rule 11 sanctions because the possibility of such reimbursement might eliminate the deterrent effect of Rule 11 on attorneys. 637 F.Supp. at 570. Here, however, we face a different situation, for the question whether Calloway may pay the judgment against LeFlore and the firm is not before us. Whether LeFlore and the firm should be jointly and severally liable for sanctions imposed on Calloway, in addition to the separate judgment against them, however, does fairly arise from Calloway's appeal. We believe district courts have discretion to make attorneys jointly and severally liable for sanctions against their clients where the attorneys should have known the conduct at issue violated Rule 11.

■ In the case of represented clients, the attorney has the principal responsibility for complying with Rule 11 and, where not misled by the client, may properly be jointly and severally liable for the judgment against the client. So long as the attorney was not misled by the client, the attorney's conduct is a proximate cause of the Rule 11 violation. How sanctions are to be structured, however, is largely a matter of the district court's discretion. We merely stress that it has power to impose joint and several liability on that portion of sanctions resulting from a party's misconduct where the attorney should have known that the misconduct violated Rule 11. We do not reach the question whether a client may be jointly and severally liable for that portion of sanctions resulting from the lawyer's misconduct.

To some extent, the financial resources of the attorneys may be relevant to the remanded questions, and Pavelic and Le-Flore should be allowed to supplement the record on that issue notwithstanding their failure to offer such evidence originally. Calloway should also be allowed to make a factual submission in addition to the present record regarding his responsibility for the facsimile claim if he chooses. The attorneys may of course answer that submission.

### 5. Rule 11 Sanctions Against Pavelic & LeFlore

Having determined that Rule 11 sanctions were properly imposed for pursuit of the facsimile claim, we now consider whether such sanctions can properly be imposed only against LeFlore, the signer of the papers in question, or against his law firm, Pavelic & LeFlore, as well. To reiterate, Judge Sweet originally imposed $100,000 in Rule 11 sanctions against Pavelic & LeFlore. 111 F.R.D. at 651–52. After a Fed.R.Civ.P. 60(b) motion by Le-Flore's partner, Radovan Pavelic, Judge Sweet reallocated the $100,000 in sanctions, imposing sanctions of $50,000 on LeFlore individually, and $50,000 on Pavelic & Le-Flore. 650 F.Supp. at 688. Judge Sweet made this reallocation because Pavelic & LeFlore was formed only in October 1984, the approximate midpoint in the Calloway–Marvel litigation. *Id.*

The text of Rule 11 is silent on whether Rule 11 sanctions may be imposed only against the attorney signing the offending paper or may also be imposed on his or her law firm. It states that every paper shall be signed "by at least one attorney of record in the attorney's individual name"; that "[t]he signature of an attorney ... constitutes a certificate by the signer that the signer has read the ... paper; that to the best of the signer's knowledge, information, and belief formed after reasonable inquiry" the paper is "well grounded in fact and is warranted by existing law" or is "a good faith argument" to extend the law. Rule 11 then provides that if a paper "is signed in violation of this rule, the court ... shall impose upon the person who signed it, a represented party, or both, an appropriate sanction...."

In what appears to be the only appellate decision on this question, the Fifth Circuit has held "that an attorney must actually sign a 'pleading, motion, [or] other paper' in order to have sanctions imposed against him." *Robinson v. National Cash Register Co.,* 808 F.2d 1119, 1128 (5th Cir. 1987). The district court in *Robinson* had imposed $4,246.25 in Rule 11 sanctions against the signer of the pleading and papers at issue and against his partner in a two-person law firm. *Id.* at 1121, 1125. The signer's partner had not signed any papers in the case, his only role having been attendance at a pretrial conference. The Fifth Circuit reversed, deeming it irrelevant that the nonsigning partner was a name partner in the law firm and that the firm's name appeared on the papers filed in the suit because "it is the attorney who signs the document, not the firm to which the attorney belongs, that certifies that the document conforms to the requirements of the rule and accepts the responsibility if it does not." *Id.* at 1132. The decision was based on a perceived need to avoid "satellite litigation over exactly who [in a firm] was responsible for a particular document." *Id.* at 1129. The court apparently assumed that "an inquiry would have to be made of the relative culpability of attorneys who did not sign but who were nevertheless involved with a particular document." *Id.*

Several lower courts, however, have imposed sanctions on law firms on whose behalf an offending paper was signed. *See, e.g., Anschutz Petroleum Marketing Corp. v. E.W. Saybolt & Co.,* 112 F.R.D. 355 (S.D.N.Y.1986); *Sony Corp. v. S.W.I. Trading, Inc.,* 104 F.R.D. 535, 542 (S.D.N.Y.1985); *Golden Eagle Distributing Corp. v. Burroughs Corp.,* 103 F.R.D. 124 (N.D. Cal.1984), *rev'd on other grounds,* 801 F.2d 1531 (9th Cir.1986). In *Golden Eagle,* for example, Judge Schwarzer sanctioned the national firm of Kirkland & Ellis for filing a legal memorandum, signed by local counsel but prepared by a Kirkland & Ellis

associate, that overstated a legal argument. *Id.* at 125 n. 1.

■ We believe that Rule 11 sanctions should generally be imposed on a signer's law firm as well as on the individual signing an offending paper, although a district court may limit the sanctions to the individual signer where exceptional circumstances exist. Nothing in the language of the Rule prohibits this construction. Although Rule 11 provides for sanctions against the "person who signed" the offending paper, sanctions need not be restricted to individuals because a law firm may be as much the endorser of a paper as the individual attorney who signs it. A law firm is thus typically listed as counsel of record, and papers are generally signed by an attorney on the firm's behalf. In the instant case, for example, the offending papers (after October 1984) were signed:

PAVELIC & LEFLORE

By: *Ray L. LeFlore(s)*

(A Member of the Firm)

Attorneys for Plaintiff

Moreover, law firms hold themselves out to clients, to courts and to other counsel as more than mere aggregations of individual practitioners sharing a phone. They create good will through a firm name and use this good will to attract clients, to achieve credibility with judges, and to ease relationships with other counsel. In many cases, clients may hire a particular attorney because of the attorney's affiliation with a certain law firm or a court may designate a lawyer as class counsel based on his or her firm's experience and reputation. Usually, moreover, partners share in the profits of all the work of the firm and also share in the costs.

Where firms are involved, the offending paper may be the joint product of background preparation and drafting by several attorneys. The individual attorney who signs a paper also may not be the one principally responsible for it. In many cases, even in a small firm, more than one lawyer may be involved in preparing a paper or in compiling the legal or factual material contained in it, and the signer of the paper may well be a junior attorney who is simply carrying out the instructions of a senior attorney. While of course we recognize that all attorneys, including the most junior,[11] must comply with Rule 11 when they sign an offending paper, limiting sanctions to the signer might encourage the sharp practice of having the most junior (or most impecunious) attorney sign a potentially offending paper.

Certainly, if a partner in a firm instructs an associate to sign a paper, basic agency principles suggest that the firm as principal should bear responsibility. *See* W. Sell, *Sell on Agency* 81–84 (1975). Under general partnership law, moreover, the partnership as a whole is responsible for the acts of a partner. The New York Partnership Law, while not controlling the interpretation of Rule 11, is nevertheless of guidance. It states that:

> Where, by any wrongful act or omission of any partner acting in the ordinary course of the business of the partnership, or with the authority of his copartners, loss or injury is caused to any person, not being a partner in the partnership, or any penalty is incurred, the partnership is liable therefor to the same extent as the partner so acting or omitting to act.

N.Y. Partnership Law § 24 (McKinney 1948). Nothing persuades us that Rule 11 dispensed with this elementary principle of partnership law. Indeed, the Seventh Circuit has even affirmed the imposition of $400 in Rule 11 sanctions against the State's Attorney of Cook County under the doctrine of respondeat superior for an infraction by an assistant state's attorney. *Frazier v. Cast,* 771 F.2d 259, 260 (7th Cir.1985).

The purposes of the 1983 amendment to Rule 11 will also be best served by holding law firms responsible for the acts of their

---

**11.** Lack of training or experience is not an issue in this case. LeFlore informed the district court that he had been a member of the law review in law school and had practiced with Sullivan & Cromwell for nine years.

attorneys. That amendment, as noted, was intended to increase deterrence of abusive and dilatory practices. *See* Fed.R.Civ.P. 11 advisory committee's note to 1983 amendment. The Advisory Committee specifically sought to increase the willingness of courts to impose sanctions and to "build[ ] upon and expand[ ]" the existing equitable doctrines for awarding sanctions. *Id.* Firm responsibility for Rule 11 sanctions will create strong incentives for internal monitoring, and greater monitoring will result in improved pre-filing inquiries and fewer baseless claims.

We believe, therefore, that sanctions ought to be imposed on a signer's firm as well as on the signer unless there are exceptional reasons not to do so. Contrary to the belief of the *Robinson* court, this interpretation will not greatly increase the amount of satellite litigation over the imposition of sanctions, because in most cases there will simply be no reason not to include the firm.[12]

■ Turning to the instant case, Pavelic & LeFlore was a true partnership in the sense that profits and expenses were shared equally by the two partners. Although LeFlore may have done most of the work, the present litigation was handled by the firm as a whole. The firm advanced more than $60,000 in out-of-pocket expenses in connection with the Calloway litigation. The record shows that other attorneys of counsel *to the firm* participated in this litigation. One attorney took a portion of Calloway's deposition and another participated in the trial. Moreover, Pavelic himself was no passive observer in the Calloway litigation. He has admitted that he "often discussed" the case with LeFlore, that he attended several depositions and days of trial, and that he insisted that Raymond L. Levites be retained as special counsel *for the trial.* The firm's role was thus typical rather than exceptional.

Pavelic & LeFlore claim, however, that several facts specific to this case militate against imposing sanctions on the firm.

These special circumstances include: (i) Pavelic & LeFlore was not in existence when the facsimile claim was first put forward in the amended complaint; (ii) LeFlore never substituted Pavelic & LeFlore for a prior firm, LeFlore & Eagan, as Calloway's counsel of record; (iii) only the pretrial order was arguably the responsibility of the firm; and (iv) the firm should "get the credit" for abandoning the facsimile claim in its amendment to the pretrial order.

For purposes of imposing sanctions, the district court accepted Pavelic's claim that the firm was "not formally formed" until October 1984, 650 F.Supp. at 686 n. 1, and then properly recognized that it could not "be held responsible for papers signed before the firm came into existence." *Id.* at 687. Nevertheless, the firm should be sanctioned for papers signed after formation of the firm that restated the facsimile claim, including answers to interrogatories and the pretrial order. The fact that these simply restated a claim developed prior to the firm's existence does not relieve the firm of its responsibilities under Rule 11, because every offending paper is a basis for sanctions. Moreover, the fact that the firm abandoned the facsimile claim (by not mentioning it) in an amendment to the pretrial order does not cure an earlier violation of Rule 11 because the propriety of a pleading is evaluated as of the time it was signed. *See Oliveri*, 803 F.2d at 1274. We also agree with Judge Sweet that LeFlore's failure to substitute Pavelic & LeFlore as Calloway's attorney of record pursuant to Local Rule 3(c) of the Southern District, *see* Rules of U.S. Dist. Cts. for the S. and E. Dists. of N.Y., Gen. Rule 3(c), does not prevent the award of sanctions against the firm, 650 F.Supp. at 687 n. 2. This is so because it is undisputed that the firm of Pavelic & LeFlore represented Calloway after October 1984. Exceptional circumstances justifying relief of sanctions on Pavelic & LeFlore are thus notably absent.

---

**12.** We do not reach the question of whether sanctions may be imposed on a law firm that prepares an offending paper but has another firm sign it. *See Golden Eagle Distributing Corp. v. Burroughs Corp.*, 103 F.R.D. 124 (N.D. Cal.1984).

We face a more difficult issue in considering the district court's allocation of sanctions between LeFlore and his former law firm. The district court used a chronological yardstick in making this allocation because "[l]ooking back on the four years which this action consumed, it is impossible to allocate to individual pleadings, motions or other papers the reasonable expenses incurred by the defendants in defending against the frivolous allegations." 650 F.Supp. at 688. While a chronological yardstick is not an ideal proxy for making such an allocation, it appears to be as accurate as any other measure available in the circumstances of this case. Although assertion of the facsimile claim to defeat the motion for summary judgment preceded formation of the firm, the interrogatory answers and proposed pretrial order came afterward. Those answers and proposed order, moreover, were filed after Tytell had been retained and had failed to support the facsimile claim.

Finally, we note that on remand the amount of sanctions for which the firm is liable may be increased as a result of our ruling regarding the sanctions imposed on Calloway. There is no injustice in this. The firm continued to represent Calloway in the Rule 11 proceedings in which it had a conflict of interest and profited from doing so. Since the total mix of sanctions is to be reviewed on remand, however, we affirm only the $50,000 imposed on the firm and, as stated earlier, allow Judge Sweet to determine on remand what additional sanctions, if any, shall be imposed on the firm.

6. *Sanctions Imposed Against Pavelic & LeFlore Under 28 U.S.C. § 1927*

Judge Sweet also imposed $23,000 in sanctions pursuant to 28 U.S.C. § 1927 (1982) against Pavelic & LeFlore for its delay in accepting a settlement offer from defendant Luis Quiros. 111 F.R.D. at 649, 651. Judge Sweet found that this offer of settlement "provided Calloway with all the relief he could possibly expect to recover from Quiros," *id.* at 649, and that Pavelic & LeFlore had acted in bad faith in delaying acceptance of the offer. 650 F.Supp. at 688.

We briefly set forth the facts relating to the Quiros settlement. Beginning in October 1983, Quiros, who was one of Calloway's partners in LMN, had been represented *pro bono* by the firm of Brown & Wood in the present litigation pursuant to a request by the Southern District Civil Litigation Panel. Because Quiros had obtained a discharge in bankruptcy, the district court granted Quiros's motion to dismiss Calloway's monetary claims. However, it denied a motion to dismiss Calloway's request for injunctive relief against Quiros. Brown & Wood subsequently offered to settle Calloway's outstanding equitable claim by proposing that Quiros would: (i) forbear from any future unauthorized use of Calloway's works, name and business reputation; (ii) subject himself to a civil contempt citation for a breach of the agreement; and (iii) remain available for trial without the need for a subpoena.

LeFlore brusquely rejected this settlement offer in a one-sentence letter from Ilyse J. Wolfe of Pavelic & LeFlore written at LeFlore's request. The letter provided no reasons for the rejection. Brown & Wood then wrote a letter to the district court describing the offer and its unexplained rejection. LeFlore responded in a letter to the court that the offer "did not afford Calloway the relief he seeks in the action" because the offer did not admit Quiros's liability to Calloway. At a March 17, 1986 pretrial conference, LeFlore again rebuffed the offer and reiterated his demand for an admission of liability from Quiros. LeFlore noted irrelevantly that any Fed.R.Civ.P. 68 offer of judgment must include costs and statutory attorney's fees. In response to a request from LeFlore, counsel for Quiros made another written offer of settlement. Without responding, LeFlore moved to strike Quiros's offer of settlement on the ground that it did not comply with the procedural requirements of Rule 68. Because the offer did not purport to be made under that Rule, the district court denied the motion. Throughout this period, counsel for Quiros continued, at considerable expense, to prepare for the upcoming trial.

On April 2, 1986, Quiros moved for sanctions against Calloway, LeFlore and Raymond L. Levites pursuant to Section 1927 and Rule 11, alleging that their conduct regarding the settlement negotiations was unreasonable, vexatious, improperly motivated and intended to harass. LeFlore argued in response that sanctions were not proper because Quiros's offers would not provide Calloway with a judgment entered by the court and enforceable as such, and costs and fees.

On April 8, two days into the trial, Judge Sweet told LeFlore "[y]ou do whatever you want," but that "Calloway should consider" that the "possibility" of sanctions existed. The next day, LeFlore entered into a stipulation pursuant to Fed.R.Civ.P. 41(a) which resulted in a dismissal of the action as against Quiros "with prejudice and without costs to each party as against the other." The stipulation also provided that:

> without admitting or denying liability, Mr. Quiros hereby agrees to forbear from all future unauthorized use of Mr. Calloway's works and name; breach of said agreement by Mr. Quiros shall be enforceable by a citation for civil contempt upon Mr. Calloway's application to the Court; Mr. Quiros shall promptly return to Mr. Calloway all property relating to the project "Skyrider" still in his custody; subsequent to execution of this Stipulation, Mr. Quiros's deposition testimony given in this action shall, if offered, be received in [as] if he were still a party....

Judge Sweet signed the stipulation. The district court's docket indicates that the stipulation of dismissal was filed on April 10, 1986. Judge Sweet informed the jury that Quiros was "no longer a party to this proceeding" on that date. LeFlore and counsel for Quiros also agreed for the record that "of course all of Mr. Quiros'[s] claims whatever they may be will be dismissed as to counterclaims."

Four months later, on August 1, 1986, the district court granted Quiros's pre-settlement motion for Section 1927 sanctions, awarding $23,000 against Pavelic & LeFlore because LeFlore "flatly refused [Qui-ros's settlement] offer without explanation and continued litigation against Quiros until finally accepting the same offer after trial had commenced." 111 F.R.D. at 649.

 District courts may not use the threat of sanctions to bring about a particular settlement of a case. *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir.1985). However, in *Kline v. Wolf*, 702 F.2d 400, 405 (2d Cir.1983), we indicated in dicta that Section 1927 sanctions might be appropriate against an attorney for needlessly and vexatiously multiplying proceedings by rejecting a settlement offer that would afford complete relief.

 In this case, we need not reach the merits of the Section 1927 sanctions because we believe that the pending motion for sanctions was extinguished when the case against Quiros was dismissed pursuant to the settlement. The day before the settlement, the district court had warned LeFlore that sanctions pursuant to the pending motion were a "possibility" if the case was not settled. It was in this context that the parties expressly agreed that "this action is dismissed, pursuant to Fed.R.Civ. P. 41(a), as against Mr. Quiros with prejudice and without costs to each party as against the other."

We faced a somewhat analogous problem in *Brown v. General Motors Corporation, Chevrolet Division*, 722 F.2d 1009 (2d Cir. 1983). In that case, the parties agreed to dismissal of plaintiff's civil rights suit "with prejudice and without costs to any party as against the other." *Id.* at 1010. We held that this release executed as part of the settlement barred a subsequent claim for attorney's fees under 42 U.S.C. § 1988 (1982). *Id.* at 1011–12. We interpreted the term "costs" as used in the settlement to include attorney's fees, *id.* at 1012 (citing *Fulps v. City of Springfield*, 715 F.2d 1088 (6th Cir.1983)), and, alternatively, held that the attorney did not have standing to seek attorney's fees in his own name under Section 1983. *Id.* at 1011.

In the instant case, we believe the parties intended the April 9 stipulation to be a settlement of all of their disputes, including the pending claim for sanctions under Sec-

tion 1927. Certainly, Pavelic & LeFlore had every reason to expect that the pending motion for sanctions would be extinguished when Quiros was dismissed from the case, particularly since the settlement was evidently a response to Judge Sweet's warning that settlement should be "consider[ed]" in light of the "possibility" of sanctions. Accordingly, we reverse the award of $23,000 in sanctions against Pavelic & LeFlore under Section 1927. We note, however, that we appreciate the efforts of Brown & Wood as pro bono counsel in this matter.

## CONCLUSION

For the foregoing reasons, we affirm the district court's imposition of Rule 11 sanctions against LeFlore and Pavelic & LeFlore. Calloway's appeal from the imposition of Rule 11 sanctions is reinstated *sua sponte*, the $100,000 sanctions against him are vacated, and the case is remanded for proceedings consistent with this opinion. On the cross-appeal, we remand for further proceedings consistent with this opinion to consider LeFlore's and Pavelic & LeFlore's liability for further sanctions, in the event that sanctions of less than $100,000 are imposed against Calloway. We reverse the award of sanctions imposed under Section 1927. This panel will hear any further appeal in this matter. Appellants LeFlore and Pavelic & LeFlore will bear all costs, to be shared equally between them, except for the appeal from the imposition of sanctions under Section 1927. No costs will be taxed on that appeal.