796 F.2d 128
 5 Fed.R.Serv.3d 981
 Jade BARRIOS, Plaintiff-Appellee,
Pacific Marine Insurance Company of Alaska, Intervenor-Appellee,
v.
PELHAM MARINE, INC., Defendant-Third Party
Plaintiff-Appellant, Cross-Appellee,
v.
TEXACO, INC., Third-Party Defendant-Appellee, Cross-Appellant.
 No. 85-3394.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 8, 1986.
 
 Lea & Gibbens, Arden J. Lea, David J. L'Hoste, New Orleans, La., for Pelham Marine, Inc.
 George B. Jurgens, III, John M. Golden, New Orleans, La., for Pacific Marine Ins. Co.
 Klein & Klein, Burton G. Klein, Donald S. Klein, New Orleans, La., for Barrios.
 Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Edward J. Koehl, Jr., Jeanmarie Lococo, New Orleans, La., for Texaco, Inc.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before REAVLEY, RANDALL and DAVIS, Circuit Judges.
 RANDALL, Circuit Judge:
 
 
 1
 Pelham appeals from the district court's order finding Pelham liable under the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. Secs. 901-950, for compensation to Barrios. Pelham also appeals from the district court's order awarding sanctions against Pelham in favor of the third-party defendant Texaco under Fed.R.Civ.P. 11. We affirm the district court's finding of liability as well as its decision to award Rule 11 sanctions against Pelham. We remand for a reassessment of the amount of these sanctions as well as for a determination of the amount of attorney's fees due to Texaco.
 
 I.
 
 2
 Pelham Marine, Inc. owns the M/V Crystal Pelham, a ship which was constructed in 1982. When it was built, the ship's ballast tanks, as well as the ladders leading down into the tanks, were coated with Texaco Rustproof Compound H, a grease-like substance designed to prevent seawater from corroding the tanks. In August, 1984, Pelham delivered the ship to Allied shipyards so that the Crystal Pelham could undergo a biennial inspection as required by the United States Coast Guard.
 
 
 3
 When Pelham delivered the ship to Allied, the starboard aft ballast tank was still covered in large part by the grease.[1] The Coast Guard inspected the entire ship, and, after so doing, ordered that a weld in the starboard aft tank be repaired. Pelham's port captain, C.J. Collins, along with a representative of the American Bureau of Shipping (ABS) (the ABS was also inspecting the ship), entered the tank requiring repair and observed that it was covered with grease. When Collins later traversed the vessel with Allied's foreman, Melvin Rodrigue, the two men visited the ballast tank together, and Collins pointed out to Rodrigue the work that Pelham needed done. Pelham asked only that the weld be fixed in accordance with the Coast Guard's instructions, not that the tanks be first degreased. Indeed, Collins testified at trial that he did not believe that complete degreasing was needed, and he further testified that he knew that Allied would not degrease the tank since the degreasing process is an expensive one which was not covered in the contract between Allied and Pelham. In addition, Collins was aware that Allied did not have the proper equipment to degrease the tank. Had degreasing been desired, Pelham would have retained a different contractor specifically to perform that task.
 
 
 4
 Jade Barrios, a contract welder, was hired by Allied to help do the necessary repair work in the ballast tank. Barrios and another welder hired to work in the starboard aft tank worked cautiously, as the conditions were extremely slippery due to the grease. The situation grew worse as the men worked since the heat from their torches caused the grease in the tank to melt, with the grease then collecting in puddles around their feet. Barrios exited the tank for a short break. Before going back down the grease-covered ladder, he used rags to wipe the grease from his boots as best he could, but Barrios slipped from the ladder anyway, injuring his back as he landed on and then slid across the tank's grease-covered bottom.
 
 II.
 
 5
 Barrios filed suit against Pelham pursuant to Sec. 5(b) of the Longshore and Harbor Workers' Compensation Act (LHWCA), as amended, 33 U.S.C. Sec. 905(b). Barrios claimed that he had slipped, fallen, and therefore injured himself as a result of the greasy conditions in the ballast tank where he had been welding. Pelham subsequently filed a cross-complaint against Texaco, asserting that Texaco should have warned the users of its anti-rust compound that the substance is greasy and that certain precautions must accordingly be taken. Texaco filed a motion for summary judgment, but the district judge reserved ruling on the motion as it was filed only shortly before the matter was scheduled to go to trial, and the court therefore preferred to carry the motion over.
 
 
 6
 Following a bench trial, the district court rendered judgment for Barrios. The court also awarded sanctions against Pelham pursuant to Fed.R.Civ.P. 11, ordering Pelham to pay Texaco $750 as a penalty for having brought a frivolous action. 106 F.R.D. 512.
 
 
 7
 On appeal, Pelham argues that the district court erred in holding the shipowner liable for the injuries sustained by Barrios. Pelham maintains that it is Allied which must bear responsibility for any injuries caused by the grease. According to Pelham, it did not have actual knowledge of a dangerous condition as well as actual knowledge that the stevedore (Allied) would not remedy whatever danger existed.
 
 
 8
 Pelham also argues that the district court erred in not finding Barrios contributorily negligent, and Pelham insists finally that the district court should not have imposed Rule 11 sanctions. On this last issue, Texaco has cross-appealed, arguing that the sanctions imposed by the district court were not sufficiently severe. Texaco also requests that this court impose further sanctions.
 
 III.
 
 9
 The central issue in this case is clear-cut: What was Pelham's duty to Barrios under Sec. 905(b) of the LHWCA once Allied commenced repair operations on the ship? The general duty of the shipowner has been specifically delineated. In Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), the Court held that the shipowner has no duty to discover hazards which develop in areas assigned to the stevedore. 451 U.S. at 172, 101 S.Ct. at 1614. In the present case, of course, the condition which led to the injury did not develop in the ballast tank after Pelham handed the ship over to Allied; rather, it existed beforehand. Although the Court in Scindia repeated that, in general, "the shipowner may rely on the stevedore to avoid exposing the longshoreman to unreasonable hazards," 451 U.S. at 170, 101 S.Ct. at 1623, the Court also intimated that under some circumstances the shipowner may be obligated to take steps to protect the longshoremen when it should know that the stevedore will not or cannot adequately remedy the dangerous condition. 451 U.S. at 175, 101 S.Ct. at 1626.
 
 
 10
 In Helaire v. Mobil Oil Co., 709 F.2d 1031 (5th Cir.1983), this court, which had previously considered the impact of Scindia on the respective duties of the shipowner and stevedore,[2] observed yet again that "[w]hile the [Scindia ] opinion itself does not address every issue of vessel owner liability under Sec. 905(b), several principles do emerge. The most basic of these is that primary responsibility for the safety of the longshoremen rests upon the stevedore." 709 F.2d at 1036 (footnote omitted). However, the shipowner does not become immune from liability merely because the stevedore has begun repair operations.
 
 As we explained in Helaire:
 
 11
 even though the owner is generally relieved of responsibility for accidents which occur once the unloading process has begun, "if [the stevedore's] judgment ... was so obviously improvident that [the owner], if it knew of the defect and that [the stevedore] was continuing to use it, should have realized the [defect] presented an unreasonable risk of harm to the longshoremen, ... in such circumstances [the owner] had a duty to intervene" and eliminate or neutralize the hazard.
 
 
 12
 709 F.2d at 1036 (quoting Scindia, 451 U.S. at 175-76, 101 S.Ct. at 1626) (brackets and ellipses in original). Applying the standards sketched in Scindia, the Helaire court held that the shipowner's liability depends upon (1) actual knowledge of the dangerous condition, and (2) actual knowledge that the stevedore would do nothing to protect his employees from the danger: "[O]nly in the event of actual knowledge of the danger and actual knowledge that [the shipowner] cannot rely on the stevedore to remedy the situation" can the vessel owner be held liable. 709 F.2d at 1038-39 (emphasis in original).
 
 
 13
 Pelham does not dispute that it is liable if these conditions are met--if, in other words, it had actual knowledge of the dangerousness of the greasy conditions as well as actual knowledge that Allied was not acting to make the conditions safe. Pelham's central claim, however, is that the district court erred in imputing to it actual knowledge of both these factors. Pelham suggests that it was justified in relying on Allied's judgment that the conditions, though perhaps dangerous, were nonetheless safe enough. Relatedly, Pelham maintains that there were procedures other than full degreasing which could have rendered the ballast tanks safe enough to weld in, and it was reasonable for Pelham to believe that Allied would utilize such procedures. Finally, Pelham again urges that part of the blame must lie with Barrios.
 
 
 14
 There is simply no support in this record for any of Pelham's contentions. The facts at trial were essentially undisputed, and the district court found that only complete degreasing would make the workplace safe, that Pelham knew this, and that Pelham knew that Allied would not degrease the tank. These factual findings are reviewed under the clearly erroneous standard, see, e.g., Stass v. American Commercial Lines, Inc., 720 F.2d 879, 883-84 (5th Cir.1983), and our review of the record confirms these findings. As the district court concluded, "the evidence is overwhelming that there is actual knowledge of the danger." 4 Rec. at 124-25. Pelham's port captain had seen the grease, and the district court found, resting its conclusion, in part, on the testimony of Allied's foreman, that only complete degreasing would make the ballast tank a safe place to weld. Yet the cost of complete degreasing is high enough that Pelham knew that, in the absence of express instructions to degrease, Allied would not conduct this procedure.[3]
 
 
 15
 Although in some circumstances "[i]t might well be 'reasonable' for the [ship] owner to rely on the stevedore's judgment that the condition, though dangerous, was safe enough," Helaire, 709 F.2d at 1039 n. 12, it was not reasonable in this case for Pelham to rely on Allied's judgment that the conditions were adequately safe. This is so because, insofar as only complete degreasing would remedy the dangerous condition, Pelham knew that the dangerous condition would not be neutralized. Moreover, the record amply supports the district court's conclusion that the conditions were unreasonably dangerous and that Pelham was aware of the danger. Pelham's contention that lesser measures could have proved adequate to render the tank a safe place to weld is not only contradicted by the facts of this case--in which the welders, for example, did try to use rags to keep their boots clean--but was not credited by the district court which concluded that only full degreasing would do, and that Pelham was aware of this.
 
 
 16
 Pelham's assertion that Barrios was contributorily negligent borders on frivolous. Barrios explained, in testimony which the district judge apparently credited, that he was reluctant to complain about the conditions for fear of losing his job. Pelham introduced no evidence at all suggesting that Barrios was the least bit careless or blameworthy. It is settled law that Pelham may not assert that Barrios was contributorily negligent merely because he elected to work under less than optimal conditions rather than quit or complain (and thereby risk dismissal). Barrios' decision to work in the grease-covered tank does not absolve Pelham of responsibility or transfer that fault to the worker. See, e.g., Hill v. Texaco, 674 F.2d 447, 452 n. 5 (5th Cir.1982). Barrios' only alternatives were to work in dangerous conditions or risk being fired, and his choice to work does not perforce subject him to comparative negligence. Harris v. Flota Mercante Grancolumbiana, S.A., 730 F.2d 296, 299 (5th Cir.1984).
 
 
 17
 Finally, both Pelham and Texaco have appealed the issue of Rule 11 sanctions. Texaco argued before the district court that Pelham's cross-complaint, which revolved centrally around the claim that Texaco should have warned Pelham that grease is greasy, was frivolous. The district court agreed, and so do we. Pelham's position on appeal is that its cross-complaint could not have been frivolous or else the district court would have granted Texaco's motion for summary judgment instead of proceeding to trial. Pelham should have been content with only a $750 penalty. Instead, it has once again argued on appeal that its cross-complaint against Texaco--which asserted that grease is slippery and that Texaco should have so informed a knowledgeable purchaser--was not wholly lacking in merit. We agree with the district court that it is. The district court's decision to carry over a motion to trial when the trial preparation has been completed and the trial is ready to begin is hardly sufficient to infuse a vapid claim with life. Accordingly, we grant Texaco's request for attorney's fees pursuant to Fed.R.App.P. 38 and remand the case to the district court for a determination of the amount of fees due to Texaco as a result of this frivolous appeal. We also vacate the district court's award of $750 for sanctions in accordance with Rule 11 so that it might, on remand, consider the possibility of imposing more severe sanctions. The judgment against Pelham in favor of Barrios is affirmed.
 
 
 18
 AFFIRMED IN PART, VACATED IN PART, AND REMANDED.
 
 
 
 [1]
 Trial testimony indicated that the typical grease job lasts approximately four years, and that when a new grease job is needed, the tanks are fully degreased before the new coating is applied
 
 
 [2]
 See, e.g., Moser v. Texas Trailer Corp., 694 F.2d 96 (5th Cir.1982); Duplantis v. Zigler Shipyards, Inc., 692 F.2d 372 (5th Cir.1982); Hill v. Texaco, Inc., 674 F.2d 447 (5th Cir.1982)
 
 
 [3]
 Where the dangerous condition is the condition that the stevedore is employed to remedy, the responsibility for neutralizing the danger is, logically, the stevedore's. See, e.g., Meserole v. M/V Fina Belgique, 736 F.2d 147 (5th Cir.1984). In this case, however, the tank's greasy condition was not what Allied was employed to repair. See supra Part I