**James P. LEMASTER, Barbara Lemaster, Stephen Lemaster, Plaintiffs–Appellants,**

**James R. Kingsley, Appellant,**

v.

**UNITED STATES of America, Harold Webb, Department of Internal Revenue, Defendants–Appellees.**

No. 89–3021.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 6, 1989.

Decided Nov. 2, 1989.

---

James R. Kingsley, Circleville, Ohio, pro se and for plaintiffs-appellants.

Barbara L. Beran, Asst. U.S. Atty., Office of the U.S. Atty., Columbus, Ohio, Gary R. Allen, Acting Chief, Michael J. Roach, Debra L. Stefanik, Trial Atty., and Ann Belanger Durney, U.S. Dept. of Justice, Appellate Section Tax Div., Washington, D.C., for defendants-appellees.

Before JONES, KEITH and GUY, Circuit Judges.

PER CURIAM.

Both plaintiffs and their attorney appeal from an award of sanctions under Federal Rule of Civil Procedure 11 and 28 U.S.C. § 1927. Plaintiffs filed suit against the United States and a revenue officer of the Internal Revenue Service after the officer (Webb) seized property ostensibly owned by Stephen Lemaster to pay the tax liabilities owed by his parents, James and Barbara Lemaster. The district court granted the defendants' motion for summary judgment as to all plaintiffs' claims except Stephen's claim under section 7426 of the Internal Revenue Code (26 U.S.C.), which was dismissed after a two-day trial. The court subsequently awarded the government sanctions against both the attorney (Kingsley) and the three plaintiffs, and all four persons now appeal. While Kingsley and the Lemasters raise a number of points on appeal, their basic argument is that this was not an appropriate case for sanctions and that, even if sanctions were allowable, the court did not compute the amount of the sanctions properly. Finding no abuse of discretion by the district court, we affirm the award of sanctions.

I.

The events relevant to this case began in 1980. At that time, the IRS determined that Barbara and James Lemaster owed substantial taxes, and the IRS commenced making assessments. Also in 1980, James and Barbara began transferring property to their son, Stephen, apparently in order to insulate the property from creditors. James and Barbara transferred their house, worth over $60,000, to Stephen in 1980, although Stephen was then a senior in high school with little or no money. The title was transferred to Stephen and there

was a claim made that the purchase price was subsequently forgiven over three years as a gift, but James and Barbara continued to reside in the home, and James indicated in subsequent, unrelated legal proceedings that he, James, was the owner of the house.

Since the 1970s, James had operated a trucking business, B & L Leasing. In the 1980s, as a result of the IRS assessments and assorted other legal problems, James was forced to shut down his operation. At approximately the same time as B & L was encountering difficulties, the Lemaster family began operating a new trucking business. All of the property and assets of the new business, "S. Lemaster Trucking," were in Stephen's name. When B & L ceased operations, S. Lemaster Trucking acquired all of B & L's property by assuming B & L's mortgage obligations. As soon as S. Lemaster Trucking commenced operations, Stephen signed a form granting James his power of attorney. Thus, while all business was conducted in Stephen's or the company's name, James controlled all aspects of S. Lemaster Trucking's day-to-day operations. In fact, Stephen soon moved to Florida to pursue his own career as a hairdresser. While he was in Florida, Stephen rarely was consulted about the trucking business, and his approval was not required for major purchases. Stephen did receive some revenues from the trucking operation over the years. However, it is also clear that Barbara and James regarded the S. Lemaster Trucking checking account as their own personal checking account, using it to pay all of their household expenses.

In 1985, after years of unsuccessful collection attempts, the delinquent tax liabilities of Barbara and James were assigned to Agent Webb for collection. Webb was unable to locate any seizable assets in the name of Barbara or James, but he did discover that James was operating a trucking business with assets listed in Stephen's name. After an investigation, which in-

cluded an interview with Stephen in Florida in which Stephen demonstrated almost no familiarity with the trucking business, Webb became convinced that Stephen Lemaster was simply a nominee for, or alter ego of, James Lemaster.

On August 14 and 15, 1986, Webb served notices of levy on a number of individuals and institutions doing business with S. Lemaster Trucking or with Stephen Lemaster. These levies produced little money, so on September 4, 1986, Webb and a number of other government officials seized a 1984 Lincoln Continental from the driveway of the house owned by Stephen but inhabited by Barbara and James. The agents also seized a number of items—trucks, engines, automobile parts, a forklift—from the business premises of S. Lemaster Trucking.

On the very day that the seizures occurred, James Lemaster tendered to Webb a check for $9,000 of the $25,820.18 tax liability. All property but the Lincoln was returned. One month later James presented Webb with a check for the balance of his outstanding tax obligation, and the Lincoln was returned.

On August 26, 1986, after the levies on individuals and institutions dealing with Stephen Lemaster, but before the seizure of the car and business properties, all three Lemasters filed suit against the United States and against Agent Webb personally. All three plaintiffs sought an injunction under 26 U.S.C. § 7426,[1] alleging that the government should be prevented from illegally seizing property titled in the name of Stephen Lemaster to pay the tax debt of James and Barbara Lemaster. James Lemaster also sought to enjoin the government from interfering with the power of attorney granted him by Stephen. Finally, Stephen sued Agent Webb, seeking damages of one billion dollars for lost property and emotional distress.

After discovery proceeded, the government moved for summary judgment as to

---

1. What was formerly the "Internal Revenue Code of 1954" has been substantially amended and redesignated as the "Internal Revenue Code of 1986." However, this case relates to tax years pre-dating the amendments, so all references to sections of the Internal Revenue Code refer to the Internal Revenue Code of 1954.

all claims. The court granted the motion as to the claims brought by James and Barbara. As taxpayers owing money they did not have standing under section 7426 to contest the seizures. James' power of attorney claim was likewise dismissed. However, the court refused to accept the government's position in respect to Stephen's section 7426 complaint, finding that a material question of fact existed as to whether James Lemaster was acting as a bona fide agent of Stephen (making the government's alter ego theory improper) or actually was the owner of the property.

The case proceeded to trial and, after a two-day bench trial, the court ruled in favor of the government. The district court found that Stephen's ownership of the property was undoubtedly a "sham" designed to insulate assets from the reach of James' and Barbara's creditors. In such a situation, the court ruled that the government had the right to seize assets held in the name of Stephen Lemaster or S. Lemaster Trucking to satisfy the tax obligations of the real owner, James Lemaster.

After announcing its decision, the court notified the parties that it was considering an award of sanctions. After both sides submitted materials relevant to the sanctions question, the court issued a memorandum opinion and order awarding the government $17,653.21 in attorney's fees and $1,919.50 in costs, for a total award of $19,572.71. The sanctions were awarded under both Fed.R.Civ.P. 11 and 28 U.S.C. § 1927. Of the total award, $4,893.17 was assessed against the attorney, Kingsley, while the three plaintiffs were made jointly and severally liable for the remainder. Plaintiffs and their counsel appeal solely from the awarding of sanctions.[2]

## II.

While the district court stated that its award was based upon violations of both Fed.R.Civ.P. 11 and 28 U.S.C. § 1927, the district court memorandum opinion only discusses standards applicable to Rule 11 questions. Following this lead, the plaintiffs and Kingsley (hereinafter referred to collectively as "plaintiffs") do not even discuss 28 U.S.C. § 1927 in their brief on appeal. It is thus clear that we are faced primarily with a dispute involving the appropriateness of sanctions issued under Rule 11.

Since the amendment of Rule 11 in 1983, this court has addressed an increasing number of appeals from Rule 11 sanctions. A set of clear standards to guide our review has thus developed:

[T]he test for the imposition of Rule 11 sanctions in this circuit, inspired by the Advisory Committee's Note to the 1983 Amendment, is whether the individual's conduct was reasonable under the circumstances. *INVST [Financial Group, Inc. v. Chem–Nuclear Systems, Inc.],* 815 F.2d [391] at 401–02; *Albright [v. Upjohn Co.],* 788 F.2d [1217] at 1221. The question of whether an individual's conduct was reasonable under the circumstances is a mixed question of law and fact. In light of the district court's more intimate knowledge of the facts of these cases, this court has determined that an abuse of discretion standard of review of the district court's decision to grant Rule 11 sanctions is proper. *INVST,* 815 F.2d at 401–02; *Albright,* 788 F.2d at 1221.

*Century Prods., Inc. v. Sutter,* 837 F.2d 247, 253 (6th Cir.1988). On appeal, we look to see whether the district court judge abused his discretion in finding plaintiffs' conduct to have been unreasonable under the circumstances.

Plaintiffs suggest that their decision to push ahead with their case was not at all unreasonable under the circumstances. They maintain that the law relating to seizure under an alter ego theory was unsettled at the time they filed suit, and that

**2.** In their brief on appeal, plaintiffs also attempt to argue that the district court erred in ruling that their first amended complaint did not relate back. This is an issue relating to the trial of the case, and not to the decision on the sanctions question. The appeal, which was filed 22 days after the decision on the motion for sanctions, but 90 days after entry of judgment in the plaintiffs' case, was timely only as to the sanctions order. Fed.R.App.P. 4(a).

their claim based on the impropriety of governmental seizure of property from the transferee of a taxpayer was well-founded. The plaintiffs assert that the district court simply failed to consider all relevant factors in deciding to award sanctions.

■ We do not find the plaintiffs' arguments to be convincing. The flaw in plaintiffs' argument lies in the misguided notion that the issue of transferee rights is somehow involved in this dispute. The plaintiffs expend a great deal of energy arguing that, according to statute and law, the government must pursue all possible direct means of satisfying a taxpayer's debt and provide some form of pre-seizure procedure before it may seize a transferee's assets to satisfy the tax debts of the transferor. 26 U.S.C. § 6901. Whether or not this is an accurate statement of the law we do not address, as it is wholly irrelevant to the case before us. Here, the government nowhere suggested that it was seizing the assets of Stephen Lemaster because he was a transferee of James Lemaster. Rather, the government made clear from the outset that it was proceeding under 26 U.S.C. § 6331, treating Stephen Lemaster as an alter ego of James Lemaster, making James Lemaster the true owner of the assets and the assets properly seizable. Under the circumstances, the district court correctly noted that counsel should have recognized that transferee and beneficial ownership principles under section 6901 are of no consequence, and that the only possible way for plaintiffs to succeed in an action for wrongful seizure would be if the government erred in treating James as the actual owner.

In dealing with the reasonableness of their actions, assuming that the government acted to pursue funds from an alter ego under section 6331, plaintiffs attempt to claim that their challenge to the government's actions was reasonable because, at the time the suit was filed the legality of seizures from nominees without pre-seizure hearings was uncertain. We disagree. The Supreme Court resolved the alter ego seizure question, in the government's favor, in *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 97 S.Ct. 619, 50 L.Ed.2d 530 (1977).[3] The tactic of proceeding against the nominee of a taxpayer for the purpose of satisfying the taxpayer's tax obligations had also been upheld by post-*G.M. Leasing* circuit court decisions. *Loving Saviour Church v. United States*, 728 F.2d 1085 (8th Cir.1984); *Valley Finance, Inc. v. United States*, 629 F.2d 162, 171–73 (D.C.Cir.1980), *cert. denied*, 451 U.S. 1018, 101 S.Ct. 3007, 69 L.Ed.2d 389 (1981). Given these facts, it was unreasonable to believe that doubt existed as to the legality of the government's theory.

Plaintiffs also argue that the district court abused its discretion in finding that plaintiffs could not have reasonably believed there was a chance of success on the pivotal, factual question of whether Stephen Lemaster was the alter ego of James Lemaster. Upon review we conclude that the district court was correct in ruling that there is no reasonable way the Lemasters or Kingsley could have doubted that James was the true owner of all contested assets.

3. Plaintiffs attempt to support their assertion that the *G.M. Leasing* case is not dispositive by referring us to the language in that opinion stating:

Our grant of certiorari was limited to the Fourth Amendment issue, and we declined to review petitioner's and Norman's son's claims that the assessments and levies should have been voided and that petitioner was not Norman's alter ego.... We therefore approach this case accepting the Court of Appeals' determinations that the assessments and levies were valid and that petitioner was Norman's alter ego.

*G.M. Leasing*, 429 U.S. at 351, 97 S.Ct. at 627. However, this statement merely indicates that the Court did not consider the factual question of whether alter ego status was proved. As to the more basic question—whether the government may properly proceed against property titled to one other than the taxpayer under an alter ego theory—the Court makes patently clear that such actions are permissible. The Court states that "[i]f petitioner was Norman's alter ego ... the Service could properly regard petitioner's assets as Norman's property ... and the Service would be empowered, under § 6331, to levy upon assets held in petitioner's name in satisfaction of Norman's income tax liability." *G.M. Leasing*, 429 U.S. at 351, 97 S.Ct. at 627.

All four individuals knew that James' transfer of assets to Stephen began at approximately the same time as the government began pursuing James for back taxes, that Stephen knew or cared little about the trucking industry, that Stephen spent four years in Florida while "his" company was operating in Ohio, that Stephen made no significant contributions to the management of the trucking company while James ran the business, and that the Lemaster family in Ohio used a transferred house as a residence and used the trucking company checking account for personal business. The district court noted that, by any standard of proof, Stephen Lemaster's ownership of the assets of the trucking company was a sham. This sham ownership was so inartful and the scheme so transparent that neither the Lemasters nor Kingsley could reasonably have thought the district court might find the seizures to have been improper.

### III.

Having determined that some level of sanctions properly could have been awarded, it remains to be determined whether the district court granted an appropriate amount. In reviewing decisions as to the amount of sanctions, this court is deferential to the district court. The district court has "wide discretion in selecting the appropriate sanction." *Jackson v. Law Firm of O'Hara, Ruberg, Osborne & Taylor*, 875 F.2d 1224, 1229 (6th Cir.1989); *INVST Financial Group, Inc. v. Chem–Nuclear Systems, Inc.*, 815 F.2d 391, 401 (6th Cir.), *cert. denied*, 484 U.S. 927, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987); *Westmoreland v. CBS, Inc.*, 770 F.2d 1168, 1174 (D.C.Cir.1985). We will reverse only if it appears that the district court abused this broad discretion.

■ Here, plaintiffs argue that the district court abused its discretion by allowing the government to recover for attorney time unnecessarily spent, for the cost of preparing witnesses who were not essential, and for costs that were not adequately itemized. We find these contentions to be without merit. The amount of time spent by the government attorneys was not unreasonable, as this case involved relatively complex issues and extensive documentary evidence which required extensive review. The fact that it took government attorneys over twice as long to prepare and present their winning case as it took Kingsley to prepare and present his groundless one does not make the governmental expenditure of time unreasonable. There is also nothing in the record to suggest that the government presented evidence which was unnecessary to its case. The plaintiffs' point regarding itemization is not well taken; the government bill as to attorney time was detailed, and the district court actually refused to grant recovery of some substantial governmental costs that the court felt had not been adequately itemized. The amount awarded as attorney fees was not only reasonable but also, as the district court noted, something of a bargain, as the government attorneys requested and received less than $54 per hour for their time, even though private attorneys would demand much more per hour of service. The district court adequately considered all relevant factors in reaching its decision as to the amount of sanctions.

### IV.

Having thus concluded that this was an appropriate case for sanctions and that the district court did not abuse its discretion in setting the amount of sanctions, this appeal is effectively resolved. However, plaintiffs raise a number of other arguments in their brief. These arguments are uniformly unpersuasive, and we address them only briefly.

■ Plaintiffs assert that the district court judge displayed his bias in this matter by *sua sponte* suggesting to the government that it seek sanctions, and that this evident bias required, at a minimum, that the judge recuse himself from hearing the motion as to sanctions. We reject this argument. According to the plain language of Rule 11, the court may impose sanctions "upon motion or upon its own initiative." Consequently, cases interpreting this language have held that a judge is

thus entitled to award sanctions *sua sponte* when such an award is deemed appropriate, so long as due process is afforded. *See Sanko S.S. Co. v. Galin*, 835 F.2d 51, 53 (2d Cir.1987); *In re Itel Securities Litigation*, 791 F.2d 672 (9th Cir.1986), *cert. denied*, 479 U.S. 1033, 107 S.Ct. 880, 93 L.Ed.2d 834 (1987). It is not only permissible for a judge to raise the question of sanctions *sua sponte*, but also expected and arguably required by Rule 11's mandatory language—"the court ... shall impose ... an appropriate sanction." No court has ruled that a judge who quite properly raises the issue of sanctions is disqualified from deciding the issue; such a rule would produce the unacceptable result of removing from the judicial process the one person best able to decide whether a party's conduct was sanctionable, and plaintiffs' argument is not supported by the language or intent of Rule 11.

■ Plaintiffs further argue that they may not be sanctioned because the fact that they survived the government's motion for summary judgment means, as a matter of law, that their claim was not unreasonable. All courts addressing this issue have concluded that mere survival of a summary judgment motion, in which all facts are construed in the non-movant's favor, does not insulate the party from sanctions if it is later determined that all factual claims were groundless. *Calloway v. Marvel Entertainment Group*, 854 F.2d 1452 (2d Cir.1988), rev'd on other grounds sub nom. *Pavelic & LeFlore v. Marvel Entertainment Group*, — U.S. —, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989); *Barrios v. Pelham Marine, Inc.*, 796 F.2d 128, 132 (5th Cir.1986).

> The mere fact that a judge declines to dismiss an action or grant summary judgment on procedural grounds, or allows an issue to go to the jury for purposes of administrative convenience, does not preclude the imposition of sanctions

or even constitute evidence that sanctions should not be granted.

G. Joseph, Sanctions: The Federal Law of Litigation Abuse p. 169 (Michie 1989). The fact that this case proceeded to trial does not affect the appropriateness of sanctions.[4]

■ As yet another argument for reversal, plaintiffs maintain that their case hinged upon credibility determinations, and they lost because the district judge chose not to credit the testimony of James Lemaster. Since they arguably would have prevailed if the judge had chosen to resolve the credibility matters differently, plaintiffs assert their claim cannot be deemed groundless. This argument fails for two separate reasons. First, plaintiffs are not correct in asserting that sanctions are impermissible in cases where the key issue is credibility. If a party loses because its witnesses were deemed incredible, and it is apparent to a party considering the case that the witness testimony is unbelievable, the offering party cannot reasonably think the credibility issues will be resolved in its favor. *Calloway*, 854 F.2d at 1472–73. Second, plaintiffs misconstrue their case below in maintaining that it was a case resting strictly on credibility determinations. In fact, the case rested much more heavily upon documentary evidence and upon the unchallenged testimony of persons familiar with the relationship of the Lemasters. This case, which took two days to try, involved much more than a swearing contest between two witnesses with different stories.

The next contention relates to perjury. During the course of the trial, the district court judge apparently became convinced that James Lemaster was perjuring himself, and the judge sought to have Lemaster convicted of perjury. This conviction never materialized, and the plaintiffs now maintain that sanctions are impermissible because they represent the judge's attempt to punish Lemaster for perjury. This argument is based on sheer speculation. Absolutely nothing in the district court memo-

---

4. Only one claim survived the motion for summary judgment; the majority of the claims were dismissed before trial. The district court granted the summary judgment motion as to all of the claims brought by James and Barbara and on Stephen's $1,000,000,000 damage claim against Webb.

randum opinion relating to sanctions suggests that the sanctions are in any way related to James Lemaster's alleged perjury. Additionally, this would not explain why the sanctions were levied against all three plaintiffs and the attorney, when only James is alleged to have committed perjury. As the district court opinion demonstrates, there is sufficient factual justification for imposing sanctions irrespective of any perjury issue.

Finally, the plaintiffs argue that, if the sanctions are found to be proper, this court should hold that all sanctions should be assessed solely against James Lemaster as the main violator. The plaintiffs argue that James committed the only wrongs because it was he who constructed the elaborate scheme to hide his assets from the IRS. However, Rule 11 sanctions do not attempt to punish anyone for conduct involved in concealing assets from the IRS. Rather, the purpose of Rule 11 sanctions is to serve to deter potential litigants from filing groundless lawsuits. Here, the relevant conduct was the filing of the suit against the United States and Agent Webb, and all three members of the Lemaster family, on the advice of their attorney, engaged in the filing of groundless lawsuits. This is the conduct for which sanctions issued, and the conduct of all three Lemasters and their attorney is equally sanctionable.

The decision of the district court is AFFIRMED.